**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Jack Osborn WATSON, Jeffrey Craig Evenson, and Dale Stanley Browning, Defendants-Appellees.**

No. 81–1306.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 7, 1982.

Decided June 2, 1982.

Rehearing and Rehearing En Banc Denied Aug. 19, 1982.

Roger W. Haines, Jr., Asst. U. S. Atty., argued, M. James Lorenz, U. S. Atty., Roger W. Haines, Jr., Asst. U. S. Atty., on the brief, San Diego, Cal., for plaintiff-appellant.

Sheldon Sherman, San Diego, Cal., argued, for defendants-appellees; Michael Pancer, Gershon D. Greenblatt, Frank J. Ragen, San Diego, Cal., on brief.

Before CHOY, GOODWIN and FARRIS, Circuit Judges.

FARRIS, Circuit Judge:

We consider whether a Coast Guard document and safety inspection of a 40-foot sailing vessel on the high seas after dark violated the Fourth Amendment. The stop and search was made without a founded suspicion that any maritime laws relating to safety or documentation were being violated. Citing our decision in *United States v. Piner*, 608 F.2d 358 (9th Cir. 1979), the district court granted defendants' motion to suppress evidence seized as a result of the stop. We reverse.

## FACTS[1]

The search and seizure occurred during a two week law enforcement patrol of the Coast Guard Cutter VENTUROUS. Commander Chapman was ordered to proceed south from Terminal Island, California to an area approximately 100 miles west of the mouth of the Gulf of California via specified way points and return. During the

| | Hours | Rate | Amount |
|---|---|---|---|
| 4. Miscellaneous | | | |
| Alston | 5 | 100 | $ 500 |
| Floyd | 3.9 | 65 | 253.50 |
| SUBTOTAL | 8.9 | | $ 753.50 |
| TOTAL | 140.4 | | $ 10,316.50 |

1. The parties entered into lengthy stipulations, specifying to what various people would testify if called and sworn as witnesses. We base our fact summary on this stipulated testimony.

patrol, as part of a general administrative plan, Commander Chapman was to board and inspect all United States vessels less than 200 feet in length found in specific windows or corridors located at established points in the Pacific. The vessel at issue in this case, the GLOBE TROTTER, was the third of six American vessels boarded during this law enforcement patrol.

The GLOBE TROTTER was first sighted, by a helicopter dispatched from the VENTUROUS, at 3:30 p. m., December 7, 1980, approximately 120 miles south-southwest of Cabo San Lucas on the southern tip of the Baja Peninsula. The GLOBE TROTTER radioed the helicopter crew and inquired whether they were looking for someone. Lt. Cdr. Searle asked where the GLOBE TROTTER was headed, and someone on the GLOBE TROTTER responded that they were just getting ready to turn into Cabo San Lucas. Lt. Cdr. Searle reported this information to Commander Chapman aboard the VENTUROUS.

Commander Chapman ordered a course change to intercept. Visual contact was made shortly after 6:00 p. m. It was dark, so when still 4,000 yards away, Commander Chapman ordered the VENTUROUS' stripe-lights energized.[2] Radio contact was made at 6:39 p. m. The VENTUROUS identified itself, and ordered the GLOBE TROTTER to douse sail, heave to, and stand by to receive a small boarding party. The VENTUROUS and GLOBE TROTTER at this time were approximately 105 miles south-southwest of Cabo San Lucas, almost 1,000 miles from United States waters.

Commander Chapman dispatched three persons in the boarding vessel. He instructed them to make a standard Coast Guard document and safety inspection, filling out Coast Guard form 4100, which covers safety equipment, floatation devices, pollution control, marine toilet inspection, document inspection, and the like. Commander Chapman did not instruct them to search for marijuana, nor did he have rea-

son to suspect that any contraband was on board the GLOBE TROTTER. He did not take certain precautions normally taken when contraband is suspected, such as sending a larger boarding party, ordering the crew of the suspected vessel on deck, and training the VENTUROUS' 50 caliber machine gun on the suspected vessel.

The boarding party arrived at the GLOBE TROTTER at approximately 7:02. They identified themselves, and stated that they were going to make "a standard Coast Guard document and safety check." Defendant Watson identified himself as the owner and operator of the boat. Defendants Evenson and Browning were the only other persons on board. As the boarding party entered the cabin to inspect the vessel's registration papers, one of them immediately noticed a heavy odor of marijuana. He then almost immediately heard a radio transmission from the VENTUROUS ordering the boarding party to muster the GLOBE TROTTER crew on the fantail of the vessel, to pat them down and place them under armed guard, and to search the vessel.

The radio transmission had been prompted by Commander Chapman's observation of 40 to 50 boxes floating in the water at positions consistent with their having come from the GLOBE TROTTER. These boxes in fact had been jettisoned from the GLOBE TROTTER in response to the Coast Guard's announcement that they intended to board and inspect the GLOBE TROTTER.

The search of the vessel led to the discovery of a cardboard box containing marijuana in the forward sail locker. This box was similar to the boxes found floating in the water, eighteen of which were recovered while the rest sank. Each box contained roughly 24 pounds of marijuana.

All three defendants subsequently were charged with conspiracy to possess marijuana on the high seas with the intent to

---

2. These stripe-lights illuminate the vessel's large orange stripes and Coast Guard seal.

distribute, in violation of 21 U.S.C. §§ 955a(a) & (c), and conspiracy to import marijuana, in violation of 21 U.S.C. § 963. The defendants moved to suppress evidence obtained as a result of the stop and search. The motion to suppress was granted, and the government appeals.

## ANALYSIS

### I. *PINER*

Defendants argue, and the district court assumed, that our decision in *United States v. Piner*, 608 F.2d 358 (9th Cir. 1979), controls and requires suppression of the evidence seized from the GLOBE TROTTER. We disagree.

*Piner* involved a random stop of a 43-foot sailboat during a routine Coast Guard patrol of San Francisco Bay. As here, the commander acted without a warrant and without probable cause to believe or a founded suspicion that a violation of the law had occurred. Also as in this case, the stop occurred after dark, at approximately 6:30 p. m. But unlike this case, the decision to board in *Piner* was made solely by the commander on board the Coast Guard cutter, was not pursuant to an administrative plan, and was for the sole purpose of inspecting for compliance with safety regulations. The sailboat was hailed, the Coast Guard cutter identified itself, and the sailboat was ordered to prepare to be boarded. Once on board, one member of the boarding party immediately noticed through an open door bags of marijuana in plain view in a lighted cabin below.

We concluded that the search and seizure in *Piner* constituted a violation of the Fourth Amendment.

> If the purpose of the random stop is to ascertain and discourage noncompliance with safety regulations, we see no reason why this purpose cannot sufficiently be accomplished during the daylight hours. Thus, reliance on this less intrusive means eliminates the need for stops and boardings after dark where no cause to suspect noncompliance exists.

We conclude that the random stop and boarding of a vessel after dark for safety and registration inspection without cause to suspect noncompliance is not justified by the governmental need to enforce compliance with safety regulations and constitutes a violation of the Fourth Amendment. A stop and boarding after dark must be for cause, requiring at least a reasonable and articulable suspicion of noncompliance, or must be conducted under administrative standards so drafted that the decision to search is not left to the sole discretion of the Coast Guard officer.

*Id.* at 361.

In deciding *Piner*, we relied heavily on the Supreme Court's then very recent decision in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). *Prouse* involved a random stop of an automobile for a routine check of driver's license and registration. The Court held that such a random stop "at the unbridled discretion of police officers," without even a reasonable suspicion that any laws were being violated, was an unreasonable seizure under the Fourth Amendment.

At the outset, the Court in *Prouse* stated that the Fourth Amendment imposes a standard of reasonableness upon the exercise of police discretion. Reasonableness implies a balancing of the competing individual and governmental interests.

> Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.

*Id.* at 654, 99 S.Ct. at 1396 (quoted in *Piner*, 608 F.2d at 360).

The intrusion must be measured in terms of both " '[the] objective intrusion—the stop itself, the questioning, and the visual inspection—.... [and] the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—....' " *Prouse*, 440 U.S. at 656, 99 S.Ct. at 1397 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976)).

The governmental interests, on the other hand, must be evaluated in light of "alternate mechanisms available, both those in use and those that might be adopted," to accomplish the legitimate government objectives. *Prouse*, 440 U.S. at 659, 99 S.Ct. at 1399.

Comparing the facts here with those of *Piner*, particularly in light of the analysis set forth in *Prouse*, we find that *Piner* does not help us determine whether the stop of the GLOBE TROTTER was reasonable under the Fourth Amendment. The overall intrusion was less here than in *Piner*, and the governmental interests were greater.

On the intrusion side of the balance, the objective intrusion here was essentially the same as that in *Piner*, but the subjective intrusion was less. The Coast Guard took several specific steps to minimize concern or fright on the part of the GLOBE TROTTER crew. The stripe-lights were energized early, so that defendants would have less reason to be fearful. Radio contact was made almost a half hour before boarding.[3] The defendants could not have had any sense of being singled out arbitrarily, as would the occupants of a car plucked from a stream of traffic. Unlike the stops in *Piner* and *Prouse*, this stop was not made on a random basis at the discretion of an officer in the field; rather, Commander Chapman was acting according to an administrative plan directing him to stop all vessels less than 200 feet in length.[4]

On the other side of the balance, the governmental interests at stake were greater than the justifications offered in *Piner*. Only the "need to enforce compliance with safety regulations" was considered in *Piner*. 608 F.2d at 361. Here, the Coast Guard also had an interest in enforcing compliance with documentation laws. International law obligates the Coast Guard to police the documentation of vessels flying the United States flag in international waters. Convention of the High Seas, Sept. 30, 1962, arts. 5 & 10, 13 U.S.T. 2312, 2315, 2316, T.I.A.S. No. 5200. Further, the alternative means cited in *Piner*, restricting administrative stops to daylight hours, is far less practical on the high seas, where efficiency dictates that Coast Guard crews work around the clock.[5] Even if it were practical, it is not clear that use of such an alternative means on the high seas would appreciably diminish the subjective intrusion felt by the crews of boarded vessels. During daylight hours a vessel still is isolated, with no basis for feeling singled out,[6] and no opportunity to feel reassured by the fact that other vessels are being subject to the same routine stop. *See Prouse*, 440 U.S. at 657, 99 S.Ct. at 1398 (quoting *Martinez-Fuerte*). Whatever fear might normally be associated with darkness can be minimized by proper use of stripe-lights and the radio, as was done here, such that on the high seas the subjective intrusion need not necessarily be significantly greater at night.

3. The GLOBE TROTTER's radio contact with the Coast Guard helicopter three hours earlier probably further reduced any legitimate subjective intrusion, though we note that Lt. Cdr. Searle did not actually tell the GLOBE TROTTER crew to expect further contact with the Coast Guard.

4. Defendants argue that Commander Chapman did exercise some discretion by choosing which specific corridors and windows to patrol within his assigned area. This argument is not supported by the record. The parties did stipulate that the VENTUROUS patrolled only half of its assigned area. But the record contains no explanation of this shortfall, nor is there any indication who decided on what basis what areas would not be covered.

5. Restricting administrative stops to daylight hours would significantly curtail the number of stops a cutter could make during a routine

patrol. Assuming the facts of this case are typical, and that a routine stop without arrests often takes four hours from the time the vessel is first sighted by helicopter, only a couple of stops a day would be possible during the winter months. The Coast Guard cannot be expected to set aside all daylight hours to only one task, at the expense of other legitimate Coast Guard functions.

6. In this sense, being on the high seas is more like being a hunter in the woods than an automobile driver in the flow of traffic. *Prouse* is not "a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties." 440 U.S. at 664, 99 S.Ct. at 1401 (Blackmun, J., joined by Powell, J., concurring).

Since the intrusion was less here than in *Piner*, and the governmental interests greater, the balance struck in *Piner* does not resolve the question whether the stop of the GLOBE TROTTER was reasonable under the Fourth Amendment. We must balance anew the competing interests at stake.

## II. PRETEXT ARGUMENT

Defendants argue that even if *Piner* is not controlling, we still do not have to decide whether routine document and safety inspections are permissible, because in any event this stop was illegal because it was motivated by criminal enforcement interests of the Coast Guard. Defendants base this argument on the parties' stipulation that if called and sworn as a witness Commander Chapman would testify that,

> My written orders, instructed me to proceed south to an area approximately 100 miles west of the mouth of the Gulf of California via specified way points and return. During the patrol, as part of a general administrative plan, I was to board and inspect all United States vessels less than 200 feet in length by patrolling specific windows or corridors located at established points in the Pacific. I was thereby to attempt to interdict vessels of American registry which were involved in drug trafficking which vessels carried controlled substances destined for the United States.

The government concedes in its brief that "one of the purposes of the administrative plan was to attempt to interdict the flow of marijuana into [the United States]." The implication is that the corridors and windows of the VENTUROUS' patrol were chosen because they were areas of suspected drug trafficking.

We rejected a similar argument made in a different context in *United States v. Goldfine*, 538 F.2d 815 (9th Cir. 1976). There federal investigators used an administrative warrant to search a pharmacy under investigation for suspected violations of the Controlled Substance Act, 21 U.S.C. §§ 801 *et seq.* The affidavit used to obtain the administrative search warrant satisfied the statutory definition of probable cause found in 21 U.S.C. § 880(d)(1), but fell short of the traditional standard of probable cause. Defendants argued unsuccessfully that the higher standard of probable cause should have been applied because the audit in reality was a search for evidence of crime rather than an administrative search.

We reject the proposition that pharmacies as to which there is probable cause to suppose a violation are by that fact rendered exempt from administrative inspection and subject only to search for evidence of crime. The administrative need for and the public interest in inspection continue to provide justification apart from the obtaining of evidence of crime.

> ... [I]f the extent of the intrusion is to be limited to an inspection under § 880(b)(1) an administrative inspection warrant upon probable cause as defined in § 880(d)(1) is all that is required.

*Id.* at 819. *Goldfine* was followed in *United States v. Prendergast*, 585 F.2d 69 (3d Cir. 1978).

The First Circuit has squarely rejected defendants' argument. *See United States v. Arra*, 630 F.2d 836 (1st Cir. 1980). There the First Circuit declined to invalidate a document and safety inspection motivated by suspicion of drug smuggling.

> Appellants point out that the Point Warde would never have intercepted the Great Mystery had the latter not first been detected by a helicopter and identified as a suspect marijuana smuggler on the basis of a list maintained by the government. We may agree that the order to stop and board the Great Mystery was not stimulated by any primary concern over the condition of its safety gear and bilges, but we do not think the motivation for a particular boarding is relevant where, as here, an objective basis for conducting the document and safety check existed. . . .
>
> ... We would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers. Moreover, the difficulty of applying a subjec-

tive standard would be monumental. . . . While the instant case may be somewhat unusual in that a cutter was specially dispatched, document and safety inspections are routinely conducted by cutters on patrol, and, as is becoming apparent from the growing case law, contraband may be discovered in the course of these routine inspections. Ascertaining the real motivation or suspicions of the officer who orders any one of these numerous inspections would prove intractable. Thus, rather than looking into the minds of the officers, we will concentrate on their actions. If the search is limited in scope to checking documentation and inspecting safety equipment and conditions, it is valid.

*Id.* at 845–46. *See United States v. Hayes,* 653 F.2d 8, 12 (1st Cir. 1981) (quoting from *Arra*).

The Third Circuit also has declined to invalidate an otherwise properly conducted document inspection stop merely because partly motivated by suspicion of criminal behavior. *See United States v. Demanett,* 629 F.2d 862 (3d Cir. 1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981):

> The defendants urge that . . . the plain view fruits of the documentation verification should nevertheless be suppressed because documentation verification was a mere pretext for a criminal investigative search. Given the evidence about the EPIC check and the wireless conversations between the POINT FRANKLIN and the Cape May Coast Guard Station it is clear that Lt. Olthuis' interest in the KRISTEN JANE went beyond an inquiry as to its documentation. We assume, therefore, that the interception of that vessel had at least a dual purpose. The trial court held that if the documentation verification purpose sufficed to justify the interception the criminal investigative purpose was irrelevant. We agree, at least in cases such as this one, in which the discovery of contraband is made in the course of an inspection no more intrusive of the normally concealed parts of the vessel than was necessary for such

verification. The Coast Guard has responsibility for enforcement of the penal provisions of the customs law, but it also has responsibility for enforcement of the laws requiring vessel documentation. The existence of the first responsibility in no way diminishes the second, and a documentation verification inspection was made.

*Id.* at 868–69. The Third Circuit reached this result even though defendants had produced evidence of specific instructions to Coast Guard personnel regarding how to conduct safety inspections in such a manner as to intrude into likely hiding places for contraband.

Support for an objective rather than a subjective test of police conduct is found in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). There the Court stated that "almost without exception in evaluating alleged violations of the Fourth Amendment the Court has just undertaken an *objective* assessment of an officer's actions in light of the facts and circumstances then known to him." *Id.* at 137, 98 S.Ct. at 1718 (emphasis added). A similar conclusion was reached in A. Amsterdam, "Perspectives on the Fourth Amendment," 58 Minn.L.Rev. 349 (1974). Discussing the problem of potential police abuse of their power to stop and frisk, Professor Amsterdam wrote:

> The second possible curb against abuse is to inquire into the officer's motive or purpose for conducting the stop and frisk. But surely the catch is not worth the trouble of the hunt when courts set out to bag the secret motivations of policemen in this context. A subjective purpose to do something that the applicable legal rules say there is sufficient objective cause to do can be fabricated all too easily and undetectably. Motivation is, in any event, a self-generating phenomenon: if a purpose to search for heroin can legally be accomplished only when accompanied by a purpose to search for a weapon, knowledgeable officers will seldom

experience the first desire without a simultaneous onrush of the second.

*Id.* at 436–37.

■ We find the reasoning of the quoted authorities to be persuasive at least in this special context. We assume that the administrative plan which led to the stop of the GLOBE TROTTER was motivated partly by suspicion of drug smuggling. However, the stop and search had an independent administrative justification, and did not exceed in scope what was permissible under that administrative justification. Therefore, we need not consider any criminal enforcement interest the Coast Guard may have had.

### III. REASONABLENESS OF ROUTINE DOCUMENT AND SAFETY INSPECTIONS

■ We must decide whether a Coast Guard document and safety inspection of a 40-foot sailing vessel on the high seas after dark pursuant to an administrative plan but without even a founded suspicion of noncompliance violates the Fourth Amendment. We conclude that such routine stops are reasonable and do not violate the Fourth Amendment.

The Coast Guard's statutory authority to stop and inspect vessels in international waters is found in 14 U.S.C. § 89(a):

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person lia-

ble to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

This statute gives the Coast Guard plenary authority to stop vessels for document and safety inspections. However, like any other federal regulation, this statute is subject to constitutional limitations. "[I]f a warrant requirement is imposed by the fourth amendment, no statute can dispose of it." *United States v. Raub,* 637 F.2d 1205, 1208 (9th Cir.), *cert. denied,* 449 U.S. 922, 101 S.Ct. 322, 66 L.Ed.2d 150 (1980). "[T]he Coast Guard's authority must be subject to the limitations imposed by the Fourth Amendment, because no act of congress can authorize a violation of the Constitution." *United States v. Odneal,* 565 F.2d 598, 601 (9th Cir. 1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978).

As already noted, the Fourth Amendment imposes a standard of reasonableness. This standard implies a balancing of the competing individual and governmental interests. To determine whether the law enforcement practice at issue is permissible, we must balance the instrusion on the defendants' Fourth Amendment interests against the promotion of legitimate governmental interests. *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (quoted *supra* at p. 767). We must consider both the objective and subjective intrusion, *id.* at 656, 99 S.Ct. at 1397, and we must evaluate the governmental interests in light of alternative mechanisms available, *id.* at 659, 99 S.Ct. at 1399.

Defendants do not deny that the government has strong, legitimate interests in securing compliance with document and safety regulations. Besides the obvious public interest in safety and the government's legitimate interest in preventing improper use of the United States flag by foreign vessels, international law requires the United States to regulate the operation of its flag vessels on the high seas. *See* Convention of the High Seas, Sept. 30, 1962, arts. 5 & 10, 13 U.S.T. 2312, 2315, 2316, T.I.A.S. No. 5200.

Nor do defendants challenge the effectiveness of Coast Guard boardings in detecting violations of documentation and safety regulations. The hazards of safety violations and the effectiveness of Coast Guard boardings in detecting such violations are amply illustrated by *U.S. Coast Guard Boating Statistics 1979 (Commandant Instruction M 16754.1A)* and *U. S. Coast Guard Office of Boating, Recreational Boating Safety Program Activities Report, Date Summary for Fiscal Years 1978–1979.* The latter report indicates that deficiencies relating to equipment or documentation were noted in 31,792 out of 47,018 Coast Guard boardings conducted in 1979. The government further offered to prove (1) that safety violations were observed in approximately 80% of vessel boardings conducted by Commander Chapman during recent patrols out of Long Beach, and (2) that in 1980 the 2,275 boardings conducted by the entire Eleventh Coast Guard District resulted in 1,171 citations, of which 368 were on the high seas. This record of effectiveness contrasts sharply with the marginal contribution to law enforcement resulting from the random stops of automobiles at issue in *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).[7]

Defendants have not shown any feasible, less intrusive means for policing compliance with safety and documentation regulations. A requirement that the Coast Guard have a founded suspicion of noncompliance before boarding would completely frustrate Coast Guard efforts to enforce compliance, simply because most documentation and safety violations cannot be detected without boarding. We have already noted the impracticality of annual dockside inspections. *See Piner,* 608 F.2d at 359–60 (9th Cir. 1979). Safety regulations apply to pleasure boats only when in use. 46 U.S.C. § 1461(c). Requiring compliance at all times would expose boat owners to considerable risk of dockside theft. Even if compliance were required at all times and the Coast Guard did conduct annual inspections, in light of the ease with which safety equipment and documentation can be removed, supplementary routine boarding checks probably still would be necessary to enforce compliance.

Roadblock-type stops obviously are not feasible on the high seas. Defendants argue that harbors can be blocked just as effectively as a highway, and that such harbor checkpoint inspections would be a more efficient, safe and effective method of enforcing safety and documentation laws. This argument overlooks the fact that many American vessels travelling in international waters only infrequently enter American ports. "Inspection schemes limited to inspecting vessels in American ports would decrease the Coast Guard's ability to police all American flag vessels, particularly since such vessels may operate far from the shores of the United States, seldom calling on American ports." *United States v. Hilton,* 619 F.2d 127, 132 (1st Cir.), *cert. denied,* 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). Thus, even if the Coast Guard were to institute harbor checkpoint stops, additional boardings, particularly on the high seas, probably would be necessary for effective enforcement procedures. Further, a

---

7. Summing up the ineffectiveness of random stops of automobiles, the Court in *Prouse* stated:

It seems common sense that the percentage of all drivers on the road who are driving without a license is very small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed. The contribution to highway safety made by discretionary stops selected from among drivers generally will therefore be marginal at best.

*Id.* at 659–660, 99 S.Ct. at 1399.

prohibition on high seas boardings would unnecessarily limit the activities of Coast Guard vessels patrolling international waters for other legitimate purposes.

The impracticality and doubtful usefulness of restricting document and safety inspections on the high seas to daylight hours already has been discussed. See n. 5 and accompanying text. At least under the facts of this case, the distinction between daylight and darkness is irrelevant.

The government interests in enforcing compliance with documentation and safety laws must be balanced against the intrusion on defendants' Fourth Amendment interests. However, the boarding in this case involved minimal objective intrusion. A heavy odor of marijuana was noticed as soon as the boarding party entered the vessel's cabin. Almost simultaneously, Commander Chapman observed 40 to 50 boxes floating in the water at positions consistent with their having been jettisoned from the GLOBE TROTTER.[8] Further, the Coast Guard had taken steps to minimize any subjective intrusion. The stop did not involve an exercise of discretion by an officer in the field, but instead was conducted pursuant to an administrative plan. Radio contact was established more than twenty min-

utes before boarding, and stripe-lights were used to illuminate the Coast Guard vessel's seal and orange stripes. There is no evidence that unnecessary force, or any force, was employed to effect the stop.

We conclude that the modest Fourth Amendment interests implicated by the stop and boarding in this case are outweighed by the government's strong interests in securing compliance with document and safety regulations.[9]

As further evidence of the reasonableness of the enforcement technique at issue, the statutory grant of authority in 14 U.S.C. § 89(a) can be traced to an enactment of the First Congress, the same Congress which proposed the Fourth Amendment. Section 31 of the Revenue Service Act provided:

> That it shall be lawful for all collectors, naval officers, surveyors, inspectors, and the officers of the revenue cutters . . . to go on board of ships or vessels in any part of the United States, or within four leagues of the coast thereof, if bound to the United States, whether in or out of their respective districts, for the purposes of demanding the manifests aforesaid, and of examining and searching the said ships or vessels; and the said officers

---

**8.** Any subsequent intrusion caused by the Coast Guard was supported by probable cause and is not relevant to our analysis.

**9.** Our holding is limited to the facts of this case. We do not have to decide today what areas of a sailing vessel may properly be entered or examined as part of a routine document and safety check. We also do not have to decide whether we would reach the same result if Commander Chapman had been acting upon his own discretion, instead of pursuant to an administrative plan. Compare *United States v. Harper*, 617 F.2d 35, 38 (4th Cir.), *cert. denied*, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980) (relying in part on the fact that the boarding was pursuant to a policy of stopping all United States vessels less than 250 feet in length and "was not one made at the will and whim of the officer in the field") *with United States v. Hilton*, 619 F.2d 127, 133 (1st Cir.), *cert. denied*, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980) ("While the Coast Guard is thus left with considerable discretion in deciding which vessels to stop, we believe such discretion is virtually unavoidable in a scheme of regulation that depends on stops conducted at

sea, far from courts and magistrates."). Nor do we have to decide today whether the Coast Guard can make stops without founded suspicion for purposes other than routine document and safety inspections. *Compare United States v. Freeman*, 660 F.2d 1030, 1033–34 (5th Cir. 1981) ("We have held on numerous occasions that the Coast Guard's plenary authority under § 89 'to stop and board American vessels on the high seas to inspect for safety, documentation, and obvious customs and *narcotics violations* to be reasonable within the meaning of the fourth amendment' .... These inspections may be conducted 'in the complete absence of suspicion of criminal activity.'" (quoting *United States v. DeWeese*, 632 F.2d 1267, 1269 (5th Cir. 1980)) *and United States v. Clark*, 664 F.2d 1174, 1175 (11th Cir. 1981) (same, quoted *infra* at p. 774) *with United States v. Hilton*, 619 F.2d at 131 ("Although the statutory language [of § 89(a)] is quite broad, the statute has been consistently construed as limiting such stops— in the absence of probable cause—to the necessary task of conducting safety and document inspections.").

respectively shall have free access to the cabin, and every other part of a ship or vessel . . . .

1 Stat. 164 (1790). This original enactment is persuasive evidence that stops and searches of the sort involved here without a warrant and without even a founded suspicion are not "unreasonable" as that word is used in the Fourth Amendment. *See generally United States v. Ramsey*, 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977), and *Boyd v. United States*, 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886) (in each case the Court relied on an enactment of the First Congress as persuasive evidence of the scope of the Fourth Amendment prohibition against *unreasonable* searches and seizures).[10]

All other circuits which have addressed this issue have reached the same conclusion that Coast Guard document and safety inspections without a warrant and without a founded suspicion of noncompliance do not violate the Fourth Amendment. *See, e.g., United States v. Hilton*, 619 F.2d 127, 131 (1st Cir.), *cert. denied*, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980) ("We believe the limited intrusion represented by a document and safety inspection on the high seas, even in the absence of a warrant or suspicion of wrongdoing, is reasonable under the fourth amendment."); *United States v. Harper*, 617 F.2d 35, 39 (4th Cir.), *cert. denied*, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980) ("To require some particularized suspicion concerning individual vessels in order to carry out a systematic inspection of all vessels in some area of the sea would encourage outright flaunting of the navigation, safety and administrative laws of the United States at the expense of our government's sovereign obligation under international law to police its flag ships."); *United States v. Shelnut*, 625 F.2d 59, 61 (5th Cir. 1980), *cert. denied*, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 818 (1981)

("A United States vessel in international waters may be boarded for the purpose of conducting such [a document and safety] inspection without any particularized suspicion of a violation of the law . . . ." (citations omitted)); *United States v. Clark*, 664 F.2d 1174, 1175 (11th Cir. 1981) (per curiam) ("The Coast Guard has plenary power under 14 U.S.C. § 89(a) to stop and board American vessels on the high seas to inspect for safety, documentation, and obvious customs and narcotics violations. The fact that this authority is exercised without probable cause or reasonable suspicion does not violate the fourth amendment."). No circuit has reached the opposite conclusion.

The decision of the district court is REVERSED.

10. In *Ramsey* the Court said: "The historical importance of the enactment of this customs statute by the same Congress which proposed the Fourth Amendment is, we think, manifest." 431 U.S. at 616–17, 97 S.Ct. at 1978–79. Similarly, in *Boyd*, the Court stated: "As this [revenue] act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment." 116 U.S. at 623, 6 S.Ct. at 528.