**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James EAGON, George Ennis, Thomas Herrmann, Defendants-Appellants.**

**Nos. 82–1030, 82–1031 and 82–1083.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 12, 1982.

Decided Nov. 22, 1982.

Rehearing Denied June 3, 1983.

---

George A. Sherinian, Santa Cruz, Cal., for Eagon.

Daniel F. Cook, Asst. Federal Public Defender, San Jose, Cal., for Enis.

Barney Elders, Santa Cruz, Cal., for Herrmann.

Ledia Schoggen, Asst. U.S. Atty., San Jose, Cal., for plaintiff-appellee.

Before MERRILL and BOOCHEVER, Circuit Judges and SMITH *, District Judge.

MERRILL, Circuit Judge:

Following a stipulated facts trial, appellants were found guilty of four counts of drug offenses in violation of 21 U.S.C. §§ 841(a)(1), 846, 952(a) and 963. On this appeal they challenge an order denying their motion to suppress marijuana and certain documents seized as a result of a warrantless search and the introduction of those items into evidence. At issue is the right of the Coast Guard without warrant to board a vessel at night for safety and document inspection, pursuant to an administrative plan, without founded suspicion of a violation of regulations.

I.

On December 5, 1980 an operations order was issued by the Coast Guard Commander of the Twelfth Coast Guard District which set up a schedule of harbor blockades designating the dates, locations and officers to be involved. The order noted that "smuggling activity increases during the holiday season" and required that enforcement patrols be conducted looking to enforcement of document and safety regulations, apparently pursuant to the Coast Guard regulation on marine document production, 46 C.F.R. § 67.73-1 (1980). The operation's code name was "Merry Jane", a slang term for marijuana.

The Monterey Group was directed to conduct 12 blockades including blockades at Morro Bay and Monterey Bay between December 12, 1980 and January 12, 1981 between the hours of 9:00 p.m. and 5:00 a.m. during which the Coast Guard group was to board all shore-bound vessels 200 feet in length or less. One of the scheduled blockades was set for December 18, 1980 with Chief Petty Officer David Wickstrom named as primary boarding officer in command of Coast Guard Vessel 41367, a 41 foot Coast Guard patrol boat with a four-man crew.

At about 10:45 p.m. on December 18, Wickstrom and the 41367 proceeded to Moss Landing on the California Coast to rendezvous with another Coast Guard vessel, the Cape Wash. Wickstrom failed to locate it and headed north. Proceeding towards Santa Cruz, the crew noticed on its radar a "large contact" which Wickstrom assumed

---

* Honorable Russell E. Smith, Senior District Judge, United States District Court for the District of Montana, sitting by designation.

to be the Cape Wash. The radar then showed a smaller contact or "blip" leaving the larger one, which Wickstrom assumed was a smaller vessel which had been boarded by the Cape Wash. The 41367 soon sighted the smaller craft which then changed course dramatically. The 41367 continued toward the larger vessel and discovered that it was not the Cape Wash but a sailing vessel, the Reverie. When first sighted the Reverie's lights were not turned on and it was stationary, but as the 41367 approached the Reverie turned on its lights and began to move shoreward. The 41367 manuevered alongside the Reverie. Wickstrom noted that its fenders were hanging over the side and that its hatches were open. The crews of the two vessels engaged in some casual conversation in which one of the three members of the Reverie crew indicated that they were having some clutch problems and were heading for Morro Bay. The 41367's coxswain then directed the Reverie to "heave to and prepare to be boarded." Wickstrom testified that his only purpose in boarding was to verify the vessel's compliance with safety and document regulations pursuant to the operations order.[1]

After boarding, Wickstrom could see through an open hatch several bales wrapped in burlap with vegetable matter protruding. He then summoned the Cape Wash and upon its arrival the Reverie crew was taken aboard. The Reverie was towed into Monterey. Coast Guard officers conducted an inspection in the course of which approximately 4,000 pounds of marijuana were found. They also found passports of the three appellants, a receipt for the marijuana, and ownership documents of the Reverie. Appellants were placed under arrest.

Before the District Court, appellants unsuccessfully sought to suppress the marijuana and documents found on the Reverie.

## II.

On this appeal, appellants contend that under this Court's holding in *United States v. Piner*, 608 F.2d 358 (9th Cir.1979), the motion to suppress should have been granted because a warrantless boarding and search of a vessel by the Coast Guard after dark constitutes a violation of the Fourth Amendment in absence of probable cause to suppose a violation of law. We agree with the District Court that *Piner* does not apply.

*Piner* involved a random stop of a pleasure vessel at night in San Francisco Bay. The sole purpose had been to ascertain and discourage noncompliance with safety regulations. There was nothing about the stopped vessel to suggest noncompliance.

It was the random character of the *Piner* stop that most concerned us. In *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979), on which we relied in *Piner*, the Court had spoken strongly on the subject. The Court there dealt with random stops of motor vehicles for spot checks of registration and licensing. It stated that without reasonable suspicion of violation "we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Id.* (citations omitted).

The Government in *Piner* strongly defended random spot checks, arguing that the practice served as an alternative to the stopping of all pleasure vessels and that without the random and unexpected charac-

---

1. Wickstrom noted several suspicious circumstances suggesting illegal activity aboard the Reverie: it initially was stationary and unlighted, but began to move shoreward and turned on its lights soon after the sighting; its fenders were over the side; its hatches were left open; and a smaller vessel which had just left the Reverie suddenly changed course. Because we hold that the search was conducted under administrative standards which removed Wickstrom's discretion in deciding whether to search, however, we need not decide whether these suspicious circumstances constituted "a reasonable and articulable suspicion of noncompliance ..." *United States v. Piner*, 608 F.2d 358, 361 (9th Cir.1979).

ter of the stop, much of its effectiveness as a discouragement of noncompliance would be lost. The Government asserted that:

> [R]andom stops are the only practicable means of ascertaining pleasure craft compliance with safety regulations, * * * [W]ithout authority to conduct random stops the congressional purpose of maritime safety will, in the case of pleasure craft, be frustrated.

608 F.2d at 361.

We noted the usefulness of the random spot check but felt that that usefulness could be accomplished by a less intrusive exercise of the practice. We stated:

> If the purpose of the random stop is to ascertain and discourage noncompliance with safety regulations, we see no reason why this purpose cannot sufficiently be accomplished during the daylight hours.

*Id.* We held:

> A stop and boarding after dark must be for cause, requiring at least a reasonable and articulable suspicion of noncompliance, or must be conducted under administrative standards so drafted that the decision to search is not left to the sole discretion of the Coast Guard officer.

*Id.*

■ The fact that the stop and boarding in this case was not random but was pursuant to an operations order completely distinguishes *Piner.* *United States v. Watson,* 678 F.2d 765, 773 (9th Cir.1982). Here Wickstrom had no choice under the order but to board the Reverie. As in *Watson* "the stop did not involve an exercise of discretion by an officer in the field but instead was conducted pursuant to an administrative plan." *Id.* at 773. There was no feasible less intrusive means of complying with the order because it was explicitly directed at this vessel.²

Appellants contend that verification of documents and safety compliance was a pretext for a criminal investigative search. They point to the order's reference to smuggling activities and the name given to the operation. The same contention was advanced and rejected in *Watson.* There we stated:

> We assume that the administrative plan which led to the stop of the GLOBE TROTTER was motivated partly by suspicion of drug smuggling. However, the stop and search had an independent administrative justification, and did not exceed in scope what was permissible under that administrative justification. Therefore, we need not consider any criminal enforcement interest the Coast Guard may have had.

*Id.* at 771. To the same effect is *United States v. Arra,* 630 F.2d 836 (1st Cir.1980), where the court stated:

> ... We would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers.

*Id.* at 846.³

### III.

■ For the first time on appeal, appellants contend that the record does not support conviction since the stipulation of facts does not explicitly state that the three appellants constituted the Reverie's crew and were present on board when the vessel was boarded. The appellants made no objection to the sufficiency of the evidence below and this contention will not be entertained here. *United States v. Veon,* 474 F.2d 1, 3 (9th Cir.1973); *United States v. Perdue,* 469 F.2d 1195, 1203 (9th Cir.1972).

JUDGMENT AFFIRMED.

BOOCHEVER, Circuit Judge, concurring:

I believe that Judge Merrill's opinion is in accord with our decisions in *United States*

---

**2.** We note that in most maritime cases it would not be feasible to establish a less intrusive means by use of checkpoints such as those used for stops of motor vehicles. Although we discuss motor vehicle stops, by way of analogy, our discussion is not intended to comment on the legality of roving road stops.

**3.** We may also note, as administrative justification for the order in our case, that an increase in the presence of noncomplying vessels may well follow from an increase in smuggling, because a vessel engaged in smuggling would seem a better than random choice for noncompliance.

*v. Piner,* 608 F.2d 358 (1979), and *United States v. Watson,* 678 F.2d 765 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982). In *Piner,* we concluded that a stop after dark must be for cause and added the dictum that the boarding "must be conducted under administrative standards so drafted that the decision to search is not left to the sole discretion of the Coast Guard officer." 608 F.2d at 361. Here, we are confronted with an administrative order removing discretion.

It is contended that the document inspection might be considered a pretext, as one of the purposes of the administrative order as indicated by its code name of "Merry Jane" was an attempt to interdict the traffic of marijuana into the United States. That contention has been answered by *Watson,* which holds that even if a purpose of the boarding is to stop smuggling it is permissible if the stop and search had an "independent administrative justification, and did not exceed in scope what was permissible under that administrative justification." 678 F.2d at 761.

We should therefor look to the scope of the boarding activity under the particular circumstances involved. Those living on their boats have a greater expectation of privacy at night. *See United States v. Piner,* 608 F.2d 358 (9th Cir. 1979). The boarding in this case, however, involved no invasion of sleeping quarters. Wickstrom, in charge of the boarding party of two, testified that the only purpose of the boarding was to verify the vessel's compliance with safety and document regulations. Once aboard, the officers did not appreciably move from their positions on deck. They asked the master to retrieve the documentation papers from the cabin and did not enter it themselves. The marijuana which was seized was seen in plain view from the officers' positions above deck. The boarding, itself, involved no intrusion into the living quarters of the Reverie crew.

As was stated in *United States v. Streifel,* 665 F.2d 414 (2d Cir. 1981), there is ... no basis for denying the government the use of investigatory stops at sea in the fact that many vessels include living quarters for their owners or their crew. While one has a more legitimate expectation of privacy in one's living quarters than in other areas, this expectation has greater relevance to the scope of a search than to the intrusiveness of a stop. 665 F.2d at 423.

I would confine our holding to the facts of this case, leaving for another day a decision as to whether a more intrusive search could be performed at night.

I also concur in the result for another reason. The facts justifying the stop are adequately summarized in footnote 1 of the opinion. Under those circumstances I believe that the boarding was justified under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), as based on reasonable suspicion.