785 F.2d 651
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jack Kelly CILLEY, Jr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Phillip Stanley KASHNIG, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Faulkner DAWSON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jonathan Dean FIGHTLIN, Defendant-Appellant.
 Nos. 84-5199 to 84-5202.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 7, 1985.
Decided Dec. 20, 1985.
As Amended March 26, 1986.
 
 Robert E. May, Asst. U.S. Atty., argued, Peter K. Nunez, U.S. Atty., Robert E. May, Asst. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.
 Michael J. McCabe, San Diego, Cal., for defendant-appellant.
 Appeal from the United States District Court for the Southern District of California.
 Before ANDERSON, BEEZER and BRUNETTI, Circuit Judges.
 J. BLAINE ANDERSON, Circuit Judge:
 
 This appeal presents the following issues:
 
 1
 (1) Whether the warrantless, suspicionless, daytime boarding of a vessel by the Coast Guard, for the purpose of assuring compliance with U.S. document and safety inspection laws violated the Fourth Amendment?
 
 
 2
 (2) Whether the subsequent below-deck inspection of the vessel, which led to the discovery of the marijuana evidence, violated the Fourth Amendment?
 
 
 3
 (3) Whether the boarding of the vessel took place in waters over which the United States has jurisdiction?
 
 I. THE FACTS
 
 4
 An evidentiary hearing was held by the district court on defendants' motion to suppress marijuana evidence seized as a result of a stop and boarding of the vessel ARRAKIS by the Coast Guard. The motion was denied. We affirm. The following pertinent facts were received during the hearing:
 
 
 5
 On November 1, 1983, the Coast Guard cutter CLOVER was running under orders directing it out on law enforcement patrol. The stated purpose of the patrol was to apprehend those craft carrying contraband, detain those persons actually engaged in smuggling, and to intercede in the flow of illicit drugs. In doing this, they were to "maximize boarding." Lieutenant Commander Porter, the commanding officer of the CLOVER, testified that whenever they are on patrol, a secondary purpose is to assure compliance with and enforcement of U.S. laws.
 
 
 6
 At about 6:30 a.m., the CLOVER made visual contact with a vessel and altered course to intercept it. At this point the CLOVER was approximately 30 miles off the coast of Baja California, Mexico. As the CLOVER approached, Officer Porter received a call requesting the CLOVER's intentions. Officer Porter responded by asking for the vessel's name, nationality, home port, etc. In response, he was told the vessel was registered in the United States under the name ARRAKIS. Officer Porter responded that a boarding party would be sent over.
 
 
 7
 Officer Porter testified that the primary purpose of the boarding was to conduct an administrative inspection in accordance with patrol orders. He stated he had never heard of the ARRAKIS prior to this time, and there was nothing about the vessel that suggested it contained contraband.
 
 
 8
 Pursuant to normal procedure, a four-member boarding party was sent to the ARRAKIS. Ensign Murphy, the boarding officer, testified that as they were boarding, one of the four persons aboard the ARRAKIS (Kashnig) stated, "Boy, are you guys in for a big surprise." When asked why, Kashnig replied, "Because this boat is loaded with marijuana." All four individuals were then given their Miranda rights. Ensign Murphy testified he noticed the smell of marijuana when he boarded and that it was especially strong in the fantail area. The boarding party proceeded with their normal inspection, checking compliance with U.S. laws and regulations, checking documentation, and looking for safety violations. During this inspection, bales of marijuana were observed on the lower deck. The parties stipulated that the ARRAKIS was towed to San Diego and that no warrant was ever procured relative to the seizure of the contraband from the ARRAKIS.
 
 
 9
 All four appellants were subsequently charged with conspiracy to possess marijuana on the high seas with intent to distribute, Title 21, U.S.C. Secs. 955a(a) and 955c; possession of marijuana on the high seas with intent to distribute, Title 21, U.S.C. Sec. 955a(a); conspiracy on the high seas to import marijuana into the United States, Title 21, U.S.C. Secs. 955a(d)(1) and 955c; possession of marijuana with intent to import into the United States, Title 21, U.S.C. Sec. 955a(d)(1); conspiracy to possess in excess of 1,000 pounds of marijuana with intent to distribute, Title 21, U.S.C. Secs. 841(a)(1), 841(b)(6), and 846; conspiracy to travel in foreign commerce in aid of racketeering enterprise, Title 18, U.S.C. Secs. 371 and 1952(a)(3); and foreign travel in aid of racketeering enterprise, Title 18, U.S.C. Sec. 1952(a)(3). Additionally, appellant Kashnig was charged with carrying a firearm during the commission of a felony, in violation of Title 18, U.S.C. Sec. 924(c); and appellant Dawson was charged with false use of a passport, in violation of Title 18, U.S.C. Sec. 1542.
 
 
 10
 On April 26, 1984, appellants entered conditional pleas of guilty, preserving their right to appeal the denial of the motion to suppress the marijuana evidence. Appellant Kashnig pled guilty to counts three, five and eight. Appellants Fightlin and Cilley pled guilty to counts three and five. Appellant Dawson pled guilty to counts three, five and nine.
 
 II. A. THE INITIAL BOARDING
 
 11
 The first question we address is whether the warrantless, suspicionless, daytime boarding of a vessel by the Coast Guard, for the purpose of assuring compliance with U.S. document and safety inspection laws violated the Fourth Amendment? Appellants argue that the stopping and boarding of the ARRAKIS was valid only if the government establishes either: (1) The stop was made pursuant to an administrative plan, removing all discretion on the part of the Coast Guard commander in determining which vessels to stop and board, or (2) There was founded suspicion to believe that the vessel was engaged in unlawful activity. We hold that neither of these is necessary in this case.
 
 
 12
 The Supreme Court has held that the suspicionless and warrantless boarding of a sailboat did not violate the Constitution. United States v. Villamonte-Marquez, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). Villamonte-Marquez may not necessarily control the outcome of this case because its holding was limited to approval of a suspicionless boarding of a vessel in domestic waters. However, this court recently applied the analysis of Villamonte-Marquez to the daytime boarding of a vessel on the high seas for the purpose of conducting a document and safety inspection. United States v. Humphrey, 759 F.2d 743 (9th Cir.1985). In that case, we held that the boarding did not violate the Fourth Amendment, notwithstanding that the boarding was conducted without a warrant, without probable cause, and without an administrative plan limiting the discretion of the Coast Guard officers. Id. at 746.
 
 
 13
 In Humphrey, we held that because a boarding for the purpose of a document inspection was a simple boarding--limited to the publicly exposed deck area--there was only a minimal intrusion on protected Fourth Amendment interests. Humphrey at 746. The Supreme Court, in Villamonte-Marquez, said such boardings are to be "judged by balancing [the] intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests." Villamonte-Marquez, 462 U.S. at 588, 103 S.Ct. at 2579, 77 L.Ed.2d at 30 (quoting Delaware v. Prouse, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667-68 (1979)). See Humphrey at 746.
 
 
 14
 This court applied the Villamonte-Marquez balancing test to the facts in Humphrey. We held that the privacy interest invaded was not substantial as it involved law enforcement officers entering the publicly exposed deck area of a vessel. Humphrey, at 746. We then found that two governmental interests substantially outweighed the minimal intrusion on protected privacy and supported the boarding of the vessel. Id. First, was the substantial governmental interest in enforcing documentation laws on the high seas. Id. The United States is obligated by treaty to enforce these laws for U.S. vessels in international waters. Id.; see United States v. Watson, 678 F.2d 765, 768 (9th Cir.), cert. denied, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982). Second, was the governmental interest in safety. Humphrey, at 747. An unsafe vessel is not only a hazard to its occupants, but can pose dangers to international commerce by sea. Id.; see United States v. Hilton, 619 F.2d 127, 131-32 (1st Cir.), cert. denied, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). The Coast Guard commander stated that one reason for boarding the vessel was to determine whether the sailboat was capable of making the journey home. Humphrey, at 747.
 
 
 15
 Here is where the case before us would appear to part with our holding in Humphrey. We specifically stated in Humphrey that
 
 
 16
 our conclusion is highly fact specific. We do not establish a general rule that approves all warrantless, suspicionless, and discretionary boardings of non-commercial vessels on the high seas. Rather, we hold that a daytime boarding for the purpose of conducting a safety inspection that is conducted in a minimally intrusive manner, when the vessel is in a location that poses a substantial risk to its occupants, is reasonable under the Fourth Amendment balancing test.
 
 
 17
 Humphrey, at 747 (emphasis added).
 
 
 18
 The stated purpose in the case before us was to conduct an administrative inspection in accordance with patrol orders. One of the patrol orders was to assure compliance with and enforcement of U.S. laws. This would include the first of the Humphrey governmental interests above--to enforce documentation laws on the high seas. However, there is no indication from the record that the safety of the ARRAKIS or its crew was ever directly in question as it was in Humphrey. Nonetheless, safety is always a factor on the high seas for vessels, both large and small. Safety of life and property on the high seas is one of the "primary" duties of the Coast Guard. 14 U.S.C. Sec. 2. Therefore, document and safety inspections are on the same level for the purposes of our analysis. There is no differentiation as both are a part of an overall administrative inspection. If a document inspection does not require founded suspicion, we can perceive no sensible, principled reason for requiring it for a safety inspection.
 
 
 19
 We do not believe that Humphrey is to the contrary nor does our analysis and holding conflict with Humphrey and the decisions from other circuits cited in support of its holding. In an earlier part of the opinion in Humphrey we made no distinction between a document inspection and safety inspection and we said, "the first question we address is whether the Coast Guard's daytime boarding of the Orca for the purpose of conducting a document and safety inspection ... violated the Fourth Amendment. We hold principally on the authority of United States v. Villamonte-Marquez, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), that the boarding did not violate the Constitution, notwithstanding that the boarding was conducted without a warrant, without probable cause and without an administrative plan limiting the discretion of the Coast Guard officers." Humphrey at 746 (emphasis added). We further stated "We do not address the question whether hazard created by location could constitute cause in this case, because of our conclusion that the balance of interests reconciled the boarding with the Fourth Amendment, even in the absence of probable cause." Humphrey at 747, n. 4 (emphasis added).
 
 
 20
 Therefore, under the Villamonte-Marquez balancing test, we must balance the privacy interests of the crew of the ARRAKIS against the governmental interests in ensuring compliance with U.S. documentation laws and safety.
 
 
 21
 As in Humphrey, the initial boarding onto the publicly exposed deck area of the ARRAKIS was only a minimal intrusion on the crew's privacy interests. In contrast, the governmental interest in enforcing compliance with U.S. documentation laws and in safety is strong. Since no other nation or authority may exercise jurisdiction over U.S. vessels on the high seas, the right to board and search may be the only practicable means for the United States as a sovereign to exert sufficient power and control over vessels flying its flag. Note, The Maritime Exception to the Fourth Amendment Requirement for a Warrant and Probable Cause--United States v. Villamonte-Marquez, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), 7 Western New England Law Review 55, 72 n. 138 (1984).
 
 
 22
 When we compare the minimal intrusion on protected privacy interests with the strong governmental interest that supported the boarding of the ARRAKIS, we conclude that the boarding itself did not violate the Fourth Amendment.
 
 B. THE BELOW-DECK INSPECTION
 
 23
 Our conclusion that the boarding itself did not violate the Constitution does not end our inquiry. We must answer a second question. Did the subsequent below-deck inspection, which led to the discovery of the marijuana evidence, violate the Fourth Amendment?
 
 
 24
 In Humphrey, this court held that after the boarding officer had learned of the existence of weapons on board, the officer had legitimate reason to go below deck in order to secure the weapons and insure the safety of the boarding party. Humphrey, at 749. The district court, in the case before us, found that there was probable cause to search the entire vessel. Probable cause is reviewed de novo. United States v. Howard, 758 F.2d 1318, 1319 (9th Cir.1985); United States v. McConney, 728 F.2d 1195, 1203 (9th Cir.1984) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 25
 After reviewing the record, we agree that probable cause existed to search the entire vessel. We base our finding on the following facts: (1) the lawful boarding; and (2) the boarding officer's testimony that he smelled marijuana when he boarded, especially in the fantail area; and (3) the following statements made by defendant Kashnig when they were boarded: "Boy, are you guys in for a big surprise." When asked why, his reply, "Because this boat is loaded with marijuana."
 
 
 26
 We do not decide whether a routine document and safety inspection may extend below deck without a warrant and probable cause. That question has been explicitly reserved by the Supreme Court, United States v. Villamonte-Marquez, 462 U.S. at 584 n. 3, 103 S.Ct. at 2577 n. 3, and this court, United States v. Watson, 678 F.2d at 773 n. 9.[1]
 
 
 27
 In sum, a two-step analysis is used when examining cases such as the one before us. First, was the initial warrantless and suspicionless boarding of the vessel violative of the Fourth Amendment? Second, if not, was the subsequent below-deck inspection violative of the Fourth Amendment? The answer in this case to both questions is "no." Therefore, we reject appellants' arguments that the marijuana evidence should have been suppressed.[2]
 
 C. JURISDICTION UPON THE HIGH SEAS
 
 28
 The final question we address is whether the boarding of the vessel took place in waters over which the United States has jurisdiction. The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas. 14 U.S.C. Sec. 89(a). The high seas mean all waters beyond the territorial seas of the United States and beyond the territorial seas of any foreign nation. 21 U.S.C. Sec. 955b(b). The high seas begin three miles from the coast of the United States and extend seaward. United States v. Chaparro-Almeida, 679 F.2d 423, 426 n. 9 (5th Cir.), cert. denied, 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1004 (1982). The stopping and boarding of the ARRAKIS occurred approximately 30 miles off the coast of Baja California, Mexico. This is more than three miles from the U.S. coast and we reject appellants' argument that it is within the territorial waters of Mexico. Appellants' reliance on an exchange of diplomatic notes between the United States and Mexico in support of their argument that the Coast Guard had no jurisdiction on the high seas is not well taken. We agree with the district court. The notes pertain to fishing rights and expressly exempt the "sovereign rights or jurisdiction for any other purpose." Therefore, the boarding took place on the high seas over which the United States has jurisdiction.
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 In Watson, we held that because the stop and search had an independent administrative justification, it did not exceed in scope what was permissible. Id. at 777. As in Watson, it is not necessary to deal with any criminal investigative purpose since there was an independent administrative duty and justification
 
 
 [2]
 Upon a finding of probable cause, the inherent mobility of a ship on the high seas excuses the need to obtain a warrant. United States v. Maybusher, 735 F.2d 366, 372 (9th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985)