UNITED STATES of America, Plaintiff-Appellee,

v.

Steve Kent ODNEAL, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

John Louis RIBANDO, George M. Challman III, and Harold Louis Bennett, Defendants-Appellants.

Nos. 76–3537, 76–3752.

United States Court of Appeals, Ninth Circuit.

Dec. 5, 1977.

Howard E. Beckler (argued), Hollywood, Cal., Hugh B. Fielder (argued), of Fielder & Fielder, North Hollywood, Cal., for defendant-appellant.

Thomas J. Nolan, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS and HUFSTEDLER, Circuit Judges, and WONG,* District Judge.

HUFSTEDLER, Circuit Judge:

Appellants were convicted for possessing with intent to distribute two tons of marihuana in violation of 21 U.S.C. § 841(a)(1). The issue is whether the district court erred in denying appellants' motion to suppress the marihuana found aboard a yacht by members of the Coast Guard and by a customs officer. We hold that detention of the yacht was justified and that probable cause emerging from the detention supported the subsequent search and seizure.

On the morning of June 2, 1976, the United States Coast Guard Cutter Point Camden was anchored in Smuggler's Cove off Santa Cruz Island, one of the Channel Islands located about 16 miles off the South-

* Honorable Dick Yin Wong, United States District Judge, District of Hawaii, sitting by designation.

ern California coastline. The Point Camden was under the command of Lieutenant Junior Grade Coddington. In addition to regular Coast Guard personnel, Customs Patrol Officer Elkins was aboard to assist the Coast Guard in the performance of its law enforcement duties. Coddington and Elkins had information that Smuggler's Cove and the Anacapa Passageway area was a site for an increasing amount of smuggling. About 9:00 a. m. on June 2, 1976, cutter personnel saw a 51-foot, 2-masted sailing sloop traveling in a northerly direction through Anacapa Passageway. The cutter pursued the vessel to ascertain its registration. The cutter caught up with the vessel and thereafter trailed it for about 30 to 35 minutes. During the surveillance period, Coddington noticed that the sloop was rigged for heavy weather, although the sea was calm and the weather was clear. The vessel was equipped with a mizzen and a jib sail; both sails were hoisted, but neither was holding wind. Both sails were free to flop back and forth. The lines from these sails were dragging in the water and the mizzen boom was unsecured and swaying back and forth. The halyard lines were dragging in the water. The condition of the lines and the sails was dangerous. Some of the cutter's officers noted that the sloop was not documented, i. e., the yacht had no name or home port attached to its stern. Normally, any vessel over 30 feet long is documented. The vessel did have registration numbers ("CF numbers") on small plaques attached to the bow pulpit. Coddington ran a check on the CF numbers with the El Paso Intelligence Center and learned that the numbers were registered to a dealer. Coddington was familiar with the dealer practice of affixing temporary numbers to a boat which was being either sold or test run, but he had never personally observed boats using temporary licensing identification of this kind.

The four passengers aboard the yacht did not acknowledge the Coast Guard's presence, even when the cutter came within 50 yards. The normal practice, under these circumstances, is that personnel aboard the yacht will acknowledge the Coast Guard's presence and signal that all is well aboard.

In addition to the heavy weather rigging, Elkins observed that the yacht was riding low in the water and Coddington told Elkins that it was unusual for a sailboat to be traveling at a rate of speed of only eight knots when it was running under both power and sail at the same time. Elkins also saw a 50-gallon rubber gas tank of the deck of the sailboat. Both Elkins and Coddington observed the raggle-taggle crew and the poor rigging of the yacht. Elkins and Coddington discussed their observations while both of them were on the bridge of the cutter.

Elkins testified that he concluded from these observations that there was a strong possibility that this vessel was coming from international waters. Coddington suspected that the sailboat was stolen and authorized a boarding party to board her. The purpose of the boarding was to inspect the registration papers and to conduct a safety inspection. Coddington accordingly authorized Bosun Dusch, another hand, and Elkins to board the craft.

The armed boarding party transferred from the cutter in a 14-foot Boston Whaler. As the Whaler pulled alongside the sailboat before boarding, Elkins detected a strong odor of marihuana coming from the yacht.

If the brief detention of the vessel necessary to permit the boarding was justifiable, the ultimate search and seizure, which revealed the marihuana, were not in violation of the requirements of the Fourth Amendment because probable cause developed before the vessel was either boarded or searched. Two questions are therefore posed: (1) Was the Coast Guard, under the circumstances, justified in detaining the vessel preparatory to boarding her, and (2) was the customs officer justified in participating in the detention?

The Coast Guard is granted very broad statutory authority to enforce and to assist in the enforcement of all applicable federal laws upon the high seas and waters subject to the jurisdiction of the United States (14 U.S.C. § 2.) In connection with its law

enforcement activities, the Coast Guard is given statutory authority to board vessels and to make "searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violation of laws of the United States." (14 U.S.C. § 89(a).) In addition, the Coast Guard is given authority to enforce regulations for the promotion of safety of life and property on the high seas and waters within the United States' jurisdiction. (14 U.S.C. § 2.)

■ All of the activities of the Coast Guard fell well within the statutory authority granted. However, as the Government acknowledges, the Coast Guard's authority must be subject to the limitations imposed by the Fourth Amendment, because no act of Congress can authorize a violation of the Constitution. (*E. g., Almeida–Sanchez v. United States* (1973) 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596.) For the purposes of this case, it is necessary only to determine whether the detention of the vessel, preparatory to boarding was justified by the application of appropriate Fourth Amendment criteria, because the smell of marihuana was detected before the vessel was actually boarded and that fact supplied probable cause for the ensuing search.

■ The detention of the vessel by the Coast Guard could not be justified on the basis that the yacht had entered from a foreign jurisdiction, thus bringing the detention and search into the category of a border search. The Coast Guard officer did not attempt to justify the stop on the basis of a reasonable certainty that the vessel had entered from a foreign jurisdiction. (*United States v. Tilton* (9th Cir. 1976) 534 F.2d 1363.)

■ Two justifications were offered for the stop by the Coast Guard: (1) Founded suspicion that the yacht was stolen and that illegal activity was afoot aboard her; and (2) hazardous conditions observed by the Coast Guard caused by the poor rigging and dragging lines. Because we conclude that the Coast Guard was authorized to stop and to detain the vessel for the purpose of calling the crew's attention to the safety hazards created by the defective rigging and the dragging lines, and for the purpose of checking the registration of the vessel, we do not reach and do not decide the question whether the Coast Guard also had justification for the stop based on founded suspicion that the vessel was engaged in illegal activity. Neither owners of vessels nor crews that are aboard vessels plying waters subject to the jurisdiction of the United States have any reasonable expectation of privacy that would exclude temporary detention by the Coast Guard for the limited purposes of checking registration and alerting the crew to hazardous conditions of the type that the Coast Guard observed in this case.

Customs Officer Elkins had independent grounds upon which to participate with the Coast Guard in briefly detaining the vessel. The objective articulable facts which Elkins observed in the presence of the Coast Guard officers supported founded suspicion that the vessel might be carrying contraband. Specific statutory authority exists supporting the customs officer's stopping the vessel. (19 U.S.C. § 1581(a).) The authority thus conferred by statute does not transgress the Fourth Amendment, when, as in this case, the intrusion to be justified is limited to the brief investigatory stop made in this case.[1] (*Cf. Brignoni-Ponce v. United States* (1975) 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607.)[2]

1. Although all the members of the boarding party were armed, the record contains no evidence that the weapons were displayed by the boarding officers in effectuating the stop and temporary detention of the vessel.

2. We express no opinion on the question whether a customs officer or the Coast Guard can search a vessel in domestic waters, without a warrant and without probable cause, when

such boarding and search are conducted at a place other than a border or the functional equivalent of a border. We, thus, do not have to decide whether we will agree or disagree with the approach taken by the Fifth Circuit in *United States v. Odom* (5th Cir. 1976) 526 F.2d 339; *United States v. Hillstrom* (5th Cir. 1976) 533 F.2d 209; *United States v. One 43-foot Sailing Vessel* (5th Cir. 1976) 538 F.2d 694.

The Coast Guard and the customs officer each had an independent justification for a brief investigatory stop of the vessel. The fact that they cooperated with one another in no way impairs the justification for the stop. Neither agency was using the other as a stalking horse.

AFFIRMED.