UNITED STATES of America, Appellee,

v.

**Paul Mayhew NORMAN, Appellant.**

UNITED STATES of America, Appellee,

v.

**Ramon Florencio ARCE, Appellant.**

UNITED STATES of America, Appellee,

v.

**Robert Leonard BRYANT, Appellant.**

Nos. 82–5129 to 82–5131.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 8, 1982.

Decided Feb. 23, 1983.

Rehearing and Rehearing En Banc Denied March 29, 1983.

Nestor Castillo, Jr., Bennie Lazzara, Jr., Tampa, Fla. (Chris Christie, Norfolk, Va., on brief), for appellants.

J. Phillip Krajewski, Asst. U.S. Atty., Norfolk, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., on brief), for appellee.

Before BUTZNER and MURNAGHAN, Circuit Judges, and WALTER E. BLACK, Jr., United States District Judge for the District of Maryland, sitting by designation.

BUTZNER, Circuit Judge:

Paul M. Norman, Ramon F. Arce, and Robert L. Bryant, were convicted of conspiracy to import, possession, and importation of marijuana. They appeal, asserting that the trial court erred in refusing to suppress 552 bales of marijuana seized aboard their vessel. We find that the search and seizure of the marijuana were justified by the plain view exception to the Fourth Amendment and affirm the judgment.

I

The vessel *Fisherman's Paradise Too* was stopped and boarded by officers from a coast guard cutter in the Chesapeake Bay. Upon boarding the *Paradise Too,* the officer in charge, Lt. James Monaghan, identified himself to the defendants and requested the ship's papers and documentation. Bryant identified himself as the captain, and offered to lead Lt. Monaghan to the pilothouse where the papers were kept. Monaghan followed Bryant to the pilothouse, noticing along the way that several bales of a tightly-wrapped substance, partially covered by a tarp, were on board the ship. Indeed, on arriving at the pilothouse, the two men had to crawl over several of the bales to reach the ship's papers. Once inside the pilothouse, Monaghan saw more bales below decks.

During this time, Monaghan also noticed a strong smell of marijuana aboard the ship. This smell, in addition to the packaging of the bales and other observations previously made by the Coast Guard cutter, led the officer to conclude that probable cause existed to arrest Bryant and his crew and to seize the vessel. After placing the defendants under arrest and securing the ship, Monaghan directed another coast guardsman to test the substance in the bales. That test showed that the bales contained marijuana, and they were seized on that basis. A search warrant for the bales was never obtained.

The defendants moved to suppress the bales prior to trial. Based on Lt. Mona-

ghan's testimony outlining the above facts, the trial judge refused to suppress the bales. Later, at trial, testimony of the coast guardsman who tested the bales was introduced. He testified to finding a one to two inch hole at the top of one of the bales from which he could see a leafy substance, and through which he pulled a sample to test. The trial judge found that, given the smell of marijuana, the packaging of the bales, and the hole in the bale, the marijuana was in plain view, and thus no warrant was required prior to a search and seizure of the bales.

## II

The starting point for any examination of a warrantless search is the principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Against this principle stand several specific exceptions. Of these, the exception for evidence discovered in "plain view" is particularly applicable to this case. *See Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

The defendants argue against the application of the plain view doctrine on the ground that there was no plain view at all. That is, the defendants contend that the marijuana, packaged and baled, was not exposed to the plain view of the Coast Guard officers. Because it was not openly visible, they argue that there could have been no plain view of the marijuana. Moreover, given the various kinds of goods capable of being packaged and shipped in bales, they say that the simple presence of the bales aboard the ship could not have led to the conclusion that they contained marijuana. Consequently, the defendants assert that no conclusion could have been drawn prior to the inspection of the contents of the bales.

■ This court has held that plain view encompasses more than simply seeing contraband. Rather, for an object to be in plain view, it must only be "obvious to the senses." *United States v. Sifuentes,* 504 F.2d 845, 848 (4th Cir.1974). To be obvious to the senses, contraband need only reveal itself in a characteristic way to one of the senses. Thus, in *Sifuentes* and *United States v. Haley,* 669 F.2d 201 (4th Cir.1982), it was held that odor alone is sufficient to place marijuana into plain view. In *Sifuentes,* the police opened a truck after impoundment and discovered several cardboard boxes. The boxes were searched and found to contain marijuana. The court held that the odor of the marijuana in the truck was sufficient to place the contraband into plain view. 504 F.2d at 848. Similarly, in *Haley,* the court upheld the warrantless search of garbage bags found to contain marijuana. While it did so on the basis of both the packages' distinctive configuration and the smell of marijuana, the court made clear that the odor alone was sufficient. "We do not imply that *both* distinctive configuration and odor are necessary to justify the search of the containers," wrote the court, for "odor alone is sufficient cause to search such containers as cardboard boxes." 669 F.2d at 204 n. 3. *See also United States v. Haynie,* 637 F.2d 227, 233, 236 (4th Cir. 1980).

■ It is uncontroverted that a strong smell of marijuana permeated the *Paradise Too.* Lt. Monaghan was well acquainted with this smell through his official duties, and recognized it immediately. Moreover, Lt. Monaghan also testified that marijuana was often baled for importation in a manner similar to the bales aboard the *Paradise Too.* In fact, he testified as to Spanish markings on the bales, markings typical of those he had seen in other instances of marijuana importation. His opportunity to see, smell, and even feel the bales while going to the pilothouse, coupled with his knowledge of marijuana importation, was sufficient to place the marijuana into his plain view. Thus, no warrant was required for a search of these containers, and they were properly admitted into evidence.

### III

It is important to note that in holding that the marijuana aboard the *Paradise Too* was in plain view, we do not authorize a general search of every vessel stopped for a documentation check. Rather, we are simply applying the plain view doctrine. The evidence seized was in plain view and did not present the issue of a generalized search of a vessel following an arrest, nor did it present any issue of a search incident to arrest.*

Finding no error in the admission of the evidence, we affirm the defendants' convictions.

AFFIRMED.

MURNAGHAN, Circuit Judge, concurring:

Concurrence this must be simply because of the precedential force exerted by *Blair v. United States,* 665 F.2d 500 (4th Cir.1981). It is an unwilling concurrence, however, for my concern about distortion of the concept of "plain view" expressed in the dissent in *Blair* is in no way diminished.

As a preliminary point, I might draw attention to the fact that there is a possible contention not asserted by the Government and consequently not before us as to whether the inspection rights of the Coast Guard and customs authorities were so great that they dispensed altogether with the need for a warrant. Arguably, the statute governing law enforcement by the Coast Guard, 14 U.S.C. § 89(a), by its terminology intends, with respect to the high seas and waters over which the United States has jurisdiction, to authorize warrantless searches of opaque containers:

> (a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes,
commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

However, a statute does not rise as high as, much less exceed the dignity of, the Constitution and particularly here of the Fourth Amendment. *Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973) ("It is clear, of course, that no Act of Congress can authorize a violation of the Constitution. But under familiar principles of constitutional adjudication, our duty is to construe the statute, if possible, in a manner consistent with the Fourth Amendment."); *United States v. Odneal,* 565 F.2d 598, 601 (9th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978) ("However, as the Government acknowledges, the Coast Guard's authority must be subject to the limitations imposed by the Fourth Amendment, because no act of Congress can au-

---

* We note that both of these issues are now before the Supreme Court on grant of certiorari. *See Florida v. Casal,* 410 So.2d 152 (Fla. 1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 50, 74 L.Ed.2d 56 (1982).

thorize a violation of the Constitution.").[1] The powers conferred by 14 U.S.C. § 89(a) consequently are to be construed and exercised with the warrant obtaining requirements of the basic law in mind.[2] The constitutional requirement that a warrant first be obtained in all save exceptional and restricted cases remains in force.[3]

One such restricted exception has evolved to cover situations where the contraband such as the marijuana here seized was, indeed, in "plain view." I write to express amazement at the conclusion that the contents of securely packaged bales, opaquely covered, were in plain view. The inspecting officers could not see the contents when they first looked at the bales. One officer

received instructions to subject the contents of the wrapped bales to chemical analysis.[4] He had to search about to ascertain whether he could locate an aperture of some kind in one of the tightly wrapped containers through which to obtain material to analyze. Ultimately, he "found" a small, approximately 1½" to 2", aperture in one of the 552 bales.[5] The need to search for the aperture repudiates the contention that the contents of the bales were in plain view. And beyond that, the contents were not in plain view in any event. The Coast Guard official conceded that he had to reach in and extract a sample of the contents before his visual inspection for the first time was able to identify the material as marijuana.[6]

**1.** Cf. *United States v. Allen,* 690 F.2d 409 (4th Cir.1982).

**2.** Even when there is probable cause to make a search, its reasonableness, for constitutional purposes, nevertheless, normally depends upon the obtention of a warrant because of "the extra protection for privacy that a warrant affords." *Almeida-Sanchez v. United States,* 413 U.S. 266, 269 n. 2, 93 S.Ct. 2535, 2538 n. 2, 37 L.Ed.2d 596 (1973).

**3.** Concededly, there was sufficient probable cause in the circumstances to conduct the warrantless search of the vessel, Fisherman's Paradise Too. *Odneal, supra,* 565 F.2d at 601. We deal, however, with the independent question of whether there is a *further* right, without a warrant, to break open and examine the contents of opaque containers located in the course of the search of the vessel itself.

A number of cases, principally and perhaps exclusively, from the Fifth Circuit, ignore, presumably because the parties before them did not raise, the distinction between the bales (or bags or boxes) themselves and their concealed contents. They, consequently, are simply not apropos. *See United States v. DeWeese,* 632 F.2d 1267 (5th Cir.1980); *United States v. Caicedo-Asprillee,* 632 F.2d 1161 (5th Cir.1980); *United States v. Espinosa-Cerpa,* 630 F.2d 328 (5th Cir.1980); *United States v. Hicks,* 624 F.2d 32 (5th Cir.1980); *United States v. Robbins,* 623 F.2d 418 (5th Cir.1980); *United States v. Cortes,* 588 F.2d 106 (5th Cir.1979); *United States v. Hillstrom,* 533 F.2d 209 (5th Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1976); *United States v. Odom,* 526 F.2d 339 (5th Cir.1975).

**4.** Why, one might ask, if the contents were plainly marijuana, was there any need for a chemical analysis? It is true, undoubtedly, that, if the bales had been transparent, revealing that the contents were vegetable matter resembling marijuana, their seizure without a warrant would have been proper, for the matter would have been in plain view. Verification by chemical analysis would not detract from the plain view and the consequent diminished expectation of privacy.

However, merely to smell what suggested marijuana to the olfactory apparatus, under circumstances where the nose was unsure enough of itself to require confirmation through chemical testing, does not add up to a plain view situation. If the bales had given off the fragrance of Earl Grey or Lapsang Suchong, they could not properly have been opened without a warrant, even though the contents were, in fact, largely marijuana, laced with heavily aromatic tea.

**5.** I pass, with only a cursory comment, the extraordinary proposition that a small hole in one bale served to place the contents of all the other 551 bales in plain view.

**6.** Q. Isn't it true, though, as you answered to Mr. Christie, that until you pinched the substance from inside of that hole you couldn't tell what it was?

A. It appeared to be marijuana before, when I looked in the hole, even though I couldn't see it very well.

Q. Didn't you just tell Mr. Christie that until you pinched—

A. I couldn't see clearly—

Q. —inside that bale you couldn't tell what it was?

A. I said I could—I could—I could see it in the bale, but I saw it—I had to pull it out to see what it was more clearly.

Q. You saw something in the bale?

A. Yes, sir.

Q. And you smelled marijuana?

A rationale, perhaps the only meritorious rationale, for the "plain view" exception is the manifestly diminished expectation of privacy where an owner or possessor leaves objects lying about readily visible to anyone who chooses to look. To say that the tightly wrapped bales aboard the Fisherman's Paradise Too were in "plain view" is to warp out of all recognizable shape a concept designed only to excuse a warrant in infrequent cases when to insist on one obviously leads to a useless bureaucratic exercise. The decisions today and in the predecessor case, *Blair,* convert the narrow exception into the general rule. From now on, if a vessel with bales aboard is stopped and searched (a) for suspected contraband or (b) merely in the course of a Coast Guard safety and documentation inspection, no warrant need be obtained to open bales, boxes and other secure containers and examine, and, if they contain marijuana, to seize the contents and use them as evidence to obtain a conviction. The discovery rate for a minute aperture in at least one of the bales will rise to 100%.

It departs from reality also to rely on "revealing configuration" as a basis for finding that the contents were in plain view. Tobacco, cotton, and tea, as well as other substances, when baled no doubt may have an appearance indistinguishable from that of baled marijuana.

As for odor as a reliable source equivalent to stripping the marijuana of all protection from its covering and revealing it to the naked eye, I will not declaim at length relying simply on what I had to say in my dissent in *Blair v. United States, supra,* 665 F.2d at 513–514. The enhancement of probability, to justify the issuance of a warrant, deriving from the odor is not the equivalent of "plain view." The smell should have no greater force than a label describing the contents, for the odor does no more than a label, and smell is far more impermanent, indeed, evanescent, than a written label which is at least as indicative of the nature of the contents and, furthermore, may be preserved and kept for presentation to the court.[7]

Since the decision in *Blair,* the Supreme Court has come down with *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982),[8] indicating a substantial

A. Yes, sir.
Q. So, you thought it was marijuana?
A. Yes, sir.
Q. But you couldn't tell from your own eyes that it was marijuana until you pulled it out, could you?
A. Yes, sir.
Q. That's correct? What I just stated—
A. Yes, sir.
Q. —is correct?
A. (The witness nodded affirmatively.)
Q. Although you smelled it and you thought that it was, until you pinched in and pulled out you couldn't tell that it was marijuana?
A. Yes, sir.

In the light of that testimony, how can the majority opinion be squared with the rule that "[t]he discovery of evidence in plain view must be inadvertent." *Coolidge v. New Hampshire,* 403 U.S. 443, 469, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971)?

7. *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), was a case where law enforcement officers lawfully acquired, without a warrant, possession of cartons of motion pictures. Labels on those boxes indicated that they contained obscene pictures. The situation is very like that of a lawful war-

rantless vessel search which turns up closed bales, bags or boxes which give off the smell of marijuana. The question, answered by the Supreme Court in the affirmative, was whether "the Fourth Amendment required the agents to obtain a warrant before they screened the films" contained in the cartons: "The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents." 447 U.S. at 654, 100 S.Ct. at 2400.

> The fact that the labels on the boxes established probable cause to believe the films were obscene clearly cannot excuse the failure to obtain a warrant; for if probable cause dispensed with the necessity of a warrant, one would never be needed.

*Id.* at 657–58, n. 10, 100 S.Ct. at 2402 n. 10.

8. The majority opinion has rested exclusively on the plain view exception to a rule otherwise requiring a warrant. *Ross* concerns the quite different question of whether, on exigency grounds making the warrantless search reasonable, closed containers in an automobile undergoing a search may be examined as to their contents, without a warrant, even though the contents are indisputably not in plain view. *See Ross, supra,* —— U.S. at ——, 102 S.Ct. at

relaxation of the rules concerning warrantless searches of containers in motor vehicles abroad on the nation's highways. *Ross* emphasized: "For countless vehicles are stopped on highways and public streets every day …." 456 U.S. at 803, 102 S.Ct. at 2161. I merely observe that a motor car stopped on a public thoroughfare has great mobility. Where law enforcement officers are justified in bringing it to a stop, yet have to postpone completion of a search while a warrant is obtained for the contents of containers, the delay may create safety hazards and potentials for absconding far greater than those present in the case of a sea-going vessel which has been commandeered and whose crew has been immobilized through arrest.[9]

Arguably the rule should be, for seagoing vessels as for motorcars, that a warrantless search may extend not only to the interior of the vessel but to the contents of closed containers as well. The law, however, has taken a very different course, and it is not open to us, at our level in the judicial hierarchy, to expand so extensively an automobile exception tailored to the peculiar circumstances of that late Twentieth Century creature, demi-God and semi-Satan, known as the automobile. Yet with *Blair,* and now with the instant case, we in the Fourth Circuit have made new law which dangerously expands the area denied the protections of the Fourth Amendment.

That expansion is alien to the teachings of such cases as *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (" 'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes,' *United States v. Jeffers,* 342 U.S. 48, 51 [72 S.Ct. 93, 95, 96 L.Ed. 59 (1951)], and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.").

If I were free to do so, I should dissent. I refrain only because *Blair* has already shone a strong spotlight marking the way. The present case merely brings us to the destination already unmistakably, though regrettably, identified in *Blair.*[10]

Finally, there is the matter of whether the present narrowing of Fourth Amend-

2163: "Given the nature of an automobile in transit, the Court recognized that an immediate intrusion is necessary if police officers are to secure the illicit substance." Thus the applicability of *Ross* is not truly presented here:

> In short, the exception to the warrant requirement established in *Carroll* [*Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)]—the scope of which we consider in this case—*applies only to searches of vehicles* that are supported by probable cause.
> *Id.*

However, the Government has sought to derive comfort from that case, and so the reasons why a rule dealing with automobile stops on public highways does not extend to ocean-going vessels are briefly outlined. In the case *sub judice,* the crew had already been arrested, and the vessel immediately entered the exclusive control of the Coast Guard. No basis for claiming exigency existed to excuse resort to a judicial officer in order to procure a warrant, before opening and examining the contents of the closely-wrapped bales.

9. Furthermore, the analogy of an ocean-going vessel, provided with sleeping quarters, to the home and its attendant greater expectations of privacy, and, conversely, its difference from the typical motor vehicle are both apparent. Even the Fifth Circuit, which, as pointed out in n. 3, *supra,* has failed to give any heed or force to the well recognized distinction between search of a vessel and search of closed containers located in the process, perceives the significance of the difference between a vessel and an automobile. *United States v. Cadena,* 588 F.2d 100, 101 (5th Cir.1979):

> However, just as there are similarities in the mobility of automobiles and vessels, there are differences in their uses. Save for the ever-increasing number of vacation vehicles and mobile homes, motor vehicles are not designed to be used as residences. The ship is the sailor's home. There is hardly the expectation of privacy even in the curtained limousine or the stereo-equipped van that every mariner or yachtsman expects aboard his vessel.

10. *Cf. United States v. Allen,* 690 F.2d 409 (4th Cir.1982). There defense counsel in another case with similar facts, under the compulsion of *Blair,* fully conceded the plain view status of marijuana packed in burlap bales and located under the hatch cover of an ocean-going vessel.

ment protection has as its purpose the achieving of some truly worthwhile objective. I perceive none. The probable cause which would have justified issuance of a warrant could not have been in question. Warrants can, in a case where the facts create reasonable grounds, such as was undoubtedly the case here, be readily secured.[11] Obtaining a warrant here would have been duck soup.[12] Why do we enervate a precious protector of the citizen, the Bill of Rights, with no better purpose than encouragement of government agents to be sloppy and unprofessional? We should be reiterating the usual exhortation: "Get a warrant."

If there is any other motive justifying the action of the majority taken in Blair and in the present case, it probably proceeds from justified judicial abhorrence for the unlovable characters who engage in drug smuggling. But the value of the Fourth Amendment derives from the consideration that only when it is applied evenhandedly—to smugglers, murderers, and rapists as well as to others—does it retain its effectiveness for the decent citizenry. "The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power." *Almeida-Sanchez, supra,* 413 U.S. at 273, 93 S.Ct. at 2539.

It happened in *Blair* that a patently improper sequestration and search of an innocent vessel not engaged in illegal activity occurred. After today flagrant invasions at sea of the rights of law abiders may be expected to become customary.

---

**11.** *See Katz v. United States,* 389 U.S. 347, 354, 88 S.Ct. 507, 515, 19 L.Ed.2d 576 (1967):

> Accepting this account of the Government's actions as accurate, it is clear that this surveillance was so narrowly circumscribed that a duly authorized magistrate, properly notified of the need for such investigation, specifically informed of the basis on which it was to proceed, and clearly apprised of the precise intrusion it would entail, could

constitutionally have authorized, with appropriate safeguards, the very limited search and seizure that the Government asserts in fact took place.

**12.** The opinion announcing the judgment of the court in *Walter v. United States, supra,* stressed that there was no warrant "even though one could easily have been obtained." *Id.* 447 U.S. at 657, 100 S.Ct. at 2401.