**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John C. HUMPHREY, W.C. Garbez,**
**and Robert D. Smith,**
**Defendants-Appellants.**

**Nos. 83–3023, 83–3025 and 83–3026.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 17, 1983.

Decided May 2, 1985.

Michael Spaan, Anchorage, Alaska, for plaintiff-appellee.

Walter Share, Anchorage, Alaska, for defendants-appellants.

Before CANBY, BOOCHEVER, and NORRIS, Circuit Judges.

NORRIS, Circuit Judge:

This appeal presents the question whether Coast Guard officers violated the Fourth Amendment when they made a warrantless, suspicionless and discretionary daytime boarding of a sailboat on the high seas, entered the below-deck cabin after learning that weapons were stowed there, and then conducted a safety inspection in the cabin.

I

On June 20, 1982, defendants Humphrey, Garbez and Smith were sailing in the north Pacific Ocean aboard the *Orca*, a thirty-nine foot sailboat.[1] After the Coast Guard cutter *Boutwell* made visual contact with the *Orca*, the *Boutwell* received a radio message from the *Orca*. The *Orca* inquired whether a boarding would take place, and asked that the boarding party bring beer with them. The *Boutwell* responded by radio, inquiring as to the destination of the *Orca* and informing the *Orca* that she would be boarded. The *Orca* reported that she was headed for her home port, San Francisco. The commander of the *Boutwell* decided to board the *Orca* for the stated purpose of conducting a routine document and safety inspection. The commander had been alerted to watch for pleasure craft carrying drugs from Asia via the North Pacific and observed that the *Orca* was riding slightly low in the water.

The *Orca* was boarded without probable cause or even reasonable suspicion that the *Orca* was either carrying contraband or was in violation of safety or document regulations.

Upon boarding the *Orca*, Coast Guard Lt. Rutz asked whether any weapons were on board. When Humphrey answered affirmatively, Lt. Rutz asked, "May I see them?" Humphrey led Lt. Rutz below deck, where he took possession of the weapons and unloaded them. Humphrey then invited Lt. Rutz to inspect the fire extinguishers, and after doing so, Lt. Rutz asked to examine the marine sanitation device, which is the bathroom facility in nautical terms. Humphrey told Lt. Rutz that he would have to move some loose sails in order to reach the device. Upon moving the sails, Lt. Rutz discovered some fifty aluminum foil packages with a few scattered seeds and green particles sticking to the outside of the packages. The officer opened the packages and discovered what he believed and a subsequent test proved to be marijuana. At that point, the defendants were arrested. A further search of the *Orca* led to the discovery of approximately 3100 pounds of marijuana valued at over $3,000,000.

Defendants were indicted under 21 U.S.C. § 955a (1982) for possessing narcotics on a vessel of American registry with the intent to distribute and for conspiracy to do so under 21 U.S.C. § 955c (1982). After the district court denied their motion to suppress the marijuana evidence on the ground that the search of the *Orca* violated the Fourth Amendment, they were convicted on both the substantive and conspiracy counts following a court trial. All three defendants were convicted on both counts; defendant Smith received thirty months incarceration, defendant Garbez was sentenced to two years, and defendant Humphrey was sentenced to four years.

---

**1.** At the time, the *Orca*'s position was about 2000 miles from the Continental United States and over 700 miles from the closest landfall in the Aleutian Islands. Although designed for personal, not commercial, use, the *Orca*, like many pleasure craft, was capable of making transoceanic voyages.

## II

### A

The first question we address is whether the Coast Guard's daytime boarding of the *Orca* for the purpose of conducting a document and safety inspection—as distinguished from the subsequent inspection of the below-deck cabin—violated the Fourth Amendment. We hold, principally on the authority of *United States v. Villamonte-Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), that the boarding did not violate the Constitution, notwithstanding that the boarding was conducted without a warrant, without probable cause and without an administrative plan limiting the discretion of the Coast Guard officers.

■ In *Villamonte-Marquez*, the Supreme Court considered a suspicionless and warrantless boarding of a sailboat located in a ship channel connecting a designated customs port of entry with the open sea. The boarding was conducted by customs officials for the purpose of a document inspection. Because a simple boarding—limited to the publicly exposed deck area—involves only a minimal intrusion on protected Fourth Amendment interests, the Court said such boardings are to be "judged by balancing [the] intrusion on the

individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests." *Id.* at 588, 103 S.Ct. at 2579 (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)).[2]

■ Thus, *Villamonte-Marquez* establishes the balancing test as the standard by which the boarding of the *Orca* must be judged. When we apply the balancing test to the facts of this case, we reach the same result as did the Supreme Court in *Villamonte-Marquez*.[3] Initially, the privacy interest invaded by the boarding of the *Orca* is not materially different from the privacy interest evaluated in *Villamonte-Marquez;* both cases involved law enforcement officers entering the publicly exposed deck area of a sailing vessel. The governmental interests in the two cases are factually distinguishable, but in both cases the governmental interest is sufficiently substantial to outweigh the minimal intrusion on protected privacy. Two important governmental interests supported the boarding of the *Orca*. First, there is a substantial governmental interest in enforcing documentation laws on the high seas because the United States is obligated by treaty to enforce documentation laws for United States vessels in international waters. *See Unit-*

2. The role of the balancing test in Fourth Amendment jurisprudence is a much mooted subject—one that has generated considerable controversy among courts and commentators and some inconsistencies in the reasoning of the opinions of the Supreme Court. *See Texas v. Brown*, 460 U.S. 730, 745, 103 S.Ct. 1535, 1544, 75 L.Ed.2d 502 (1983) (Powell, J., concurring). The limited role of the balancing test was recently acknowledged in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), in which the Court invalidated evidence obtained as a result of a 90 minute detention of luggage at an airport. Justice O'Connor, writing for the Court, emphasized the importance of the distinction between minimal and substantial intrusions: "We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests,

the opposing law enforcement interests can support a seizure based on less than probable cause." *Id.* 103 S.Ct. at 2642. Thus, *Place* sets the standard for application of the balancing test: a minimal intrusion on protected privacy interests is measured by the balancing test, but a substantial intrusion, like the intrusion in *Place*, must satisfy the probable cause requirement of the Fourth Amendment.

3. *Villamonte-Marquez* does not directly control the outcome in this case, because its holding was limited to approval of a suspicionless boarding of a vessel in a ship canal connecting a customs port of entry with the high seas. The governmental interest in enforcing the customs laws—the interest that was decisive in *Villamonte-Marquez*—does not support a search on the high seas, where nothing like the functional equivalent of the border is involved. *Cf. Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539–40, 37 L.Ed.2d 596 (1973).

*ed States v. Watson,* 678 F.2d 765, 768 (9th Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982). Second, the governmental interest in safety was particularly strong in this case because of the course and location of the *Orca* in the North Pacific. The Magistrate's finding that the commander of the *Boutwell* decided to board the *Orca* to determine whether the sailboat was capable of making the journey home is supported by the testimony of the commander of the *Boutwell* that he would have been remiss in his duty to insure the safety of United States citizens at sea if he had not made a safety inspection of the *Orca* under the circumstances.[4] More generally, an unsafe vessel is not only a hazard to its occupants, but can pose dangers to international commerce by sea. *See United States v. Hilton,* 619 F.2d 127, 131–32 (1st Cir.), *cert. denied,* 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980).

■ When we compare the minimal intrusion on protected interests with the strong governmental interest that supported the boarding of the *Orca,* we conclude, as the Supreme Court did in *Villamonte-Marquez,* that the boarding itself was "reasonable" and hence did not violate the Fourth Amendment. Our conclusion is highly fact specific. We do not establish a general rule that approves all warrantless, suspicionless, and discretionary boardings of noncommercial vessels on the high seas. Rather, we hold that a daytime boarding for the purpose of conducting a safety inspection that is conducted in a minimally intrusive manner, when the vessel is in a location that poses a substantial risk to its occupants, is reasonable under the Fourth Amendment balancing test. No broader conclusion is required to decide this case.

Our conclusion is consistent with this court's precedent. Before *Villamonte-Marquez,* it would have been an open question whether the boarding of the *Orca* violated the Fourth Amendment. Our court had approved a brief detention in territorial waters when there was cause in the form of a visible safety hazard, *United States v. Odneal,* 565 F.2d 598 (9th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978), but we disapproved a warrantless and suspicionless boarding at night, reasoning that a nighttime boarding constituted a substantial subjective intrusion on privacy interests protected by the Fourth Amendment. *United States v. Piner,* 608 F.2d 358 (9th Cir.1979). In two subsequent cases, however, *United States v. Watson,* 678 F.2d 765, *United States v. Eagon,* 707 F.2d 362 (9th Cir.1982), *cert. denied,* — U.S. —, 104 S.Ct. 483, 78 L.Ed.2d 680 (1983), we approved suspicionless nighttime boardings pursuant to an administrative plan that limited the discretion of the Coast Guard officers. Thus, the constitutionality of the boarding of the *Orca,* which was conducted during the day. but without an administrative plan, was not clearly settled by our cases.

Our holding today—that under some circumstances the Coast Guard may conduct warrantless and suspicionless boardings for the purpose of conducting document and safety inspections on the high seas—is supported by the decisions of our sister

---

**4.** Indeed, the Magistrate found that the safety hazard presented by the location and course of the *Orca* constituted "cause" for the boarding. "Cause" for a safety and document inspection would normally be established by factors providing reason to believe a violation of safety or document regulations existed. We do not address the question whether hazard created by location could constitute cause in this case, because of our conclusion that the balance of interests reconciled the boarding with the

circuits. The First,[5] Fifth [6] and Eleventh [7] Circuits have all held that warrantless and suspicionless boardings for the purpose of conducting document and safety inspections do not violate the Fourth Amendment even in the absence of an administrative plan. Although the Second,[8] Third [9] and Fourth [10] Circuits have required an administrative plan or reasonable suspicion in the cases in which boardings of noncommercial vessels have been approved, most of these cases fail to differentiate document and safety inspections from other boardings, and none of the cases requiring cause or an administrative plan for safety and document inspections was decided with the benefit of the Supreme Court's decision in *Villamonte-Marquez.*

## B

Our decision that the boarding itself did not violate the Fourth Amendment does not extend to the search of the below-deck living quarters. Thus, we now turn to the question whether the below-deck inspection of the marine sanitation device, which led to the discovery of the contraband, was

constitutionally permissible. We answer this question in two steps. Initially, we consider whether Lt. Rutz legitimately gained access to the below-deck cabin. Then, we inquire into the legitimacy of his continuation of the safety inspection after he went below deck.

First, we hold that Lt. Rutz's entry into the below-deck cabin was lawful. Once Humphrey voluntarily told Lt. Rutz that there were firearms below deck, securing those weapons to insure the safety of the boarding party provided a legitimate reason to go below deck. The limited, protective "search" for and temporary "seizure" of the guns was justified by security considerations. *Cf. Terry v. Ohio,* 392 U.S. 1, 24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968) (approving limited search "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm" incident to an investigative stop).

Second, we conclude that Lt. Rutz's below-deck continuation of the safety and document inspection by attempting to ex-

---

Fourth Amendment, even in the absence of probable cause.

5. *See United States v. Burke,* 716 F.2d 935, 937 (1st Cir.1983); *United States v. Dillon,* 701 F.2d 6 (1st Cir.1983); *United States v. Arra,* 630 F.2d 836, 842 (1st Cir.1980); *United States v. Hilton,* 619 F.2d at 131; *United States v. Zurosky,* 614 F.2d 779, 788 & n. 10 (1st Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980).

6. *See United States v. DeWeese,* 632 F.2d 1267, 1269 (5th Cir.1980), *cert. denied* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981); *United States v. Williams,* 617 F.2d 1063, 1077 (5th Cir.1980) (en banc); *United States v. Erwin,* 602 F.2d 1183, 1184 (5th Cir.1979) (per curiam), *cert. denied,* 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980); *United States v. Warren,* 578 F.2d 1058, 1064–65 (5th Cir.1978), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980); *United States v. One (1) 43 Foot Sailing Vessel,* 538 F.2d 694 (5th Cir.1976) (per curiam).

7. *See United States v. Luis-Gonzalez,* 719 F.2d 1539, 1549 (11th Cir.1983); *United States v. Thompson,* 710 F.2d 1500, 1505 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 730, 79 L.Ed.2d 190 (1984).

8. *United States v. Streifel,* 665 F.2d 414, 422 (2d Cir.1981); *see also id.* at 419 & n. 8 (adopting requirement of "reasonable suspicion, based on articulable, objective facts" for boardings on the high seas); *United States v. Pinto-Mejia,* 720 F.2d 248, 262 (2d Cir.1983) (following *Streifel* ), *modified,* 728 F.2d 142 (1984).

9. *United States v. Demanett,* 629 F.2d 862, 867 (3d Cir.1980) (limiting authorization of boardings without cause to document inspections of commercial vessels), *cert. denied* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981).

10. In *United States v. Harper,* 617 F.2d 35 (4th Cir.), *cert. denied,* 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980), the reasoning of the Fourth Circuit suggested that an administrative plan might be necessary to validate a boarding under § 89(a), even of a commercial vessel. *Id.* at 38–39. This decision was not discussed in the later opinion in *United States v. Allen,* 690 F.2d 409 (4th Cir.1982), which also appears to have involved a commercial vessel, but contains language to the effect that a § 89(a) inspection "does not require probable cause nor reasonable suspicion and is not in itself a violation of the Fourth Amendment." *Id.* at 411.

amine the marine sanitation device, after he had legitimately gained access to the cabin, did not violate the Fourth Amendment.[11] Once Lt. Rutz was legitimately below deck, the defendants' remaining expectation of privacy in the small cabin area was minimal.[12] The additional intrusion upon protected privacy interests generated by an inspection of the marine sanitation device was almost nil.[13] We conclude that the inspection of the marine sanitation device was reasonable under the circumstances. There was almost no invasion of protected Fourth Amendment privacy to weigh against the governmental interest in conducting a routine safety and document inspection.

Finally, we note the narrow basis of our holding that the warrantless and suspicionless below-deck safety inspection did not violate the Fourth Amendment. Lt. Rutz had independent cause to go below deck in order to secure the weapons and insure the safety of the boarding party. Thus, we have not decided whether a routine safety and document inspection may intrude into the privacy of below-deck living quarters absent such cause. Indeed, the question whether a document and safety inspection may extend below deck without a warrant and probable cause has been explicitly reserved by the Supreme Court, *United States v. Villamonte-Marquez*, 462 U.S. at 584 n. 3, 103 S.Ct. at 2577 n. 3 (1983), and this court. *United States v. Watson*, 678 F.2d at 773 n. 9. Moreover, this case does not require us to reach the question whether, absent the necessity to go below deck to insure the safety of the boarding party, a warrant would be required for a search of below-deck living quarters.[14]

## C

In the course of his inspection of the marine sanitation device, Lt. Rutz moved some sails and observed opaque aluminum foil packages, which later proved to contain marijuana. The last step of our Fourth Amendment inquiry requires us to evaluate the discovery and opening of the opaque aluminum foil packages.[15] The magistrate found that Lt. Rutz could see seeds and bits of green particles visible underneath the cellophane tape on one or

---

**11.** The appellants' brief relied almost exclusively on the claim that the initial boarding of the *Orca* violated the Fourth Amendment because of the absence of an administrative plan. After appellants' opening brief was filed, the Supreme Court handed down its decision in *Villamonte-Marquez*, undermining this contention. At oral argument, the appellants pressed the contention that the intrusion into the below-deck area violated the Constitution.

**12.** *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), teaches us to protect those subjective expectations of privacy which society is prepared to recognize as reasonable or legitimate. *Id.* at 361, 88 S.Ct. at 516 (Harlan J., concurring); *see also Rakas v. Illinois*, 439 U.S. 128, 143 & n. 12, 99 S.Ct. 421, 430 & n. 12, 58 L.Ed.2d 387 (1978). The subjective expectation of privacy in the below-deck cabin was minimal once outsiders were legitimately present there.

**13.** We note that the search did not extend to private lockers or other private areas not within the cabin in which Lt. Rutz was legitimately present.

**14.** In *Watson*, we held that a warrant was not required for an on-deck safety and document inspection, but we did not consider the applica-

bility of the Warrant Clause to a below deck search. 678 F.2d at 773–74. There is some dispute on the applicability of the Warrant Clause to marine searches. *Compare United States v. Arra*, 630 F.2d at 842 ("The mobility and numerosity of vessels, and the vastness of the sea, make it impossible to provide for issuance of administrative warrants, in advance, on a vessel-by-vessel basis. And the alternative, issuance of some kind of open-ended process prior to a cutter's departure on patrol ... would seem to be largely a formalistic exercise." (citations omitted)); *with* Note, *High on the Seas: Drug Smuggling, The Fourth Amendment, and Warrantless Searches at Sea*, 93 Harv.L.Rev. 725, 729 (1980) ("Since the [exigent circumstances] doctrine is primarily based on the impossibility of securing a warrant, warrantless searches should be allowed only in situations where the facts demonstrate that a warrant could not have been obtained in advance and that delaying the search would have created a likelihood that the vessel would flee or evidence would otherwise be lost.").

**15.** The question whether the requirements of the "plain view" doctrine have been met is a mixed question of law and fact that we review de novo. *See United States v. Rabb*, 752 F.2d 1320, 1324 (9th Cir.1984).

more of the packages that looked to him like marijuana, giving Lt. Rutz probable cause to seize the packages. We approve this determination.

■ The seeds and green particles were in "plain view." The requirements for invoking the plain view doctrine were articulated in *United States v. Chesher*, 678 F.2d 1353 (9th Cir.1982): first, the officer must be legitimately present; second, the discovery must be inadvertent; and third, it must be immediately apparent that it is evidence that is seen. *Id.* at 1356. Here, we have already found the first prong of the test is satisfied. Lt. Rutz was legitimately attempting to inspect the marine sanitation device. We also conclude that the second requirement of the plain view doctrine is met: the discovery was inadvertent. Lt. Rutz was filling out a standard Coast Guard form that required inspection of the marine sanitation device. Humphrey told Lt. Rutz that the sails had to be moved. The packages were discovered underneath the sails. Under these circumstances, it would be difficult to argue that the discovery of the foil packets was anything but inadvertent.

Appellants argue that the third requirement for application of the plain view doctrine—that it be immediately apparent to the officer that evidence was present—is not satisfied. We conclude, however, that upon observing the packages, Lt. Rutz acquired a reasonable belief that it was contraband he was seizing. This conclusion is supported by the magistrate's finding that Lt. Rutz saw seeds and green particles on the outside of the packages and inferred that the packages contained contraband.

Humphrey now argues that the presence of seeds and green herbal material is consistent with his statement to Lt. Rutz that the packages contained dried fruit, and therefore that it was not immediately apparent to Lt. Rutz that the packages constituted evidence. But "under the plain view doctrine ... the incriminating nature of an object is generally deemed 'immediately apparent' where police have probable cause to believe it is evidence of crime." *Chesher*,

678 F.2d at 1357 (quoting *United States v. Ochs*, 595 F.2d 1247, 1258 (2d Cir.1979); *see also Texas v. Brown*, 460 U.S. 730, 741–42, 103 S.Ct. 1535, 1542–43, 75 L.Ed.2d 502 (1983). Here, the green herbal material and seeds gave Lt. Rutz probable cause to believe that the packages contained an illicit substance. Therefore, we conclude that he legitimately seized the foil packages.

■ We need not address the question whether a warrant would be required under some circumstances to open and search the aluminum foil packages. In this case, the remote area in which the vessel was found and the impossibility of obtaining a search warrant within a practical period of time created an exigent circumstance eliminating the necessity for a warrant. *See Watson*, 678 F.2d at 773–74.

In sum, neither the boarding of the *Orca*, nor the inspection of the marine sanitation device, nor the opening of the foil packages violated the Fourth Amendment. We thus reject appellants' arguments that the marijuana evidence should have been suppressed.

### III

Finally, we address appellants' contention that there was insufficient evidence to support their convictions. All three defendants were convicted of conspiracy in violation of 21 U.S.C. § 955c and possession of marijuana on the high seas in violation of 21 U.S.C. § 955a(a). We consider the evidence in the light most favorable to the government. *See Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). We will first review the sufficiency of the evidence against Garbez and Smith and then review the evidence against Humphrey.

### A

■ The primary evidence against Garbez and Smith is the undisputed fact that they were crew members of the *Orca*, a single cabin vessel ladened with 642 packages of marijuana that weighed 3,100 pounds. This is not a case where the con-

traband was located in a closed hold where even a large bulk of contraband would not necessarily be known to members of the crew. *See United States v. Willis*, 639 F.2d 1335, 1338–39 (5th Cir.1981). The marijuana was stored throughout the cabin and was four and one-half to five feet deep in the area of the marine sanitation device. There was testimony that the cabin reeked with the odor of marijuana. Where a large quantity of contraband pervades the only cabin of a vessel returning from a long voyage, it is reasonable to infer that the occupants were engaged in more than mere knowing presence. *See United States v. Williams*, 630 F.2d 1322, 1328 (9th Cir.), *cert. denied*, 449 U.S. 865, 101 S.Ct. 197, 66 L.Ed.2d 83 (1980). Smith and Garbez were not mere passengers; they spent every day and night aboard the *Orca* for a considerable period of time. In this case, as in *United States v. Escobar*, 674 F.2d 469, 478 (5th Cir.1982), the sheer bulk of the contraband cargo supports the inference that crew members possessed contraband with the intent to distribute it and participated in a conspiracy to do so. As we concluded in *United States v. Allen*, 675 F.2d 1373 (9th Cir.1980), *cert. denied*, 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981), given the scale of the undertaking and the necessity for secrecy, "no one would have been admitted to the enterprise who was not to be trusted completely with knowledge of its criminal character." *Id.* at 1384.

■ Moreover, Humphrey made numerous statements incriminating Garbez and Smith. There was testimony that he stated, "We've thrown our charts away and you'll never know where we've been," and "We thought about sinking the *Orca*, but there was a chance the Coast Guard wouldn't spot us in the water ..." Viewed in the light most favorable to the government, such statements support an inference of a concerted plan of action including all three defendants. In addition, Garbez made incriminating statements that he needed the $20,000 he was paid for the voyage and that he did not know the identity of the persons with whom Humphrey dealt. A photograph found on the *Orca* showed Garbez on top of a bunk laden with packages containing marijuana. Smith made no incriminating statements, but given all of the evidence, the magistrate's conclusion that he possessed and conspired to possess the marijuana is supported by sufficient evidence.

## B

■ Humphrey does not challenge the sufficiency of the evidence to support his possession conviction; he only challenges the sufficiency of the evidence to support his conspiracy conviction on the theory that if the evidence does not support the convictions of Smith and Garbez, he cannot be convicted of conspiring with himself. We have already rejected the contention that there was insufficient evidence to support the convictions of Smith and Garbez; therefore, we must reject this derivative claim by Humphrey. Not only was Humphrey the captain of a vessel containing a large quantity of contraband, but he also made a number of incriminating admissions.

We conclude that more than sufficient evidence supports the substantive and conspiracy convictions of all three defendants.

AFFIRMED.